129 F.3d 419
 39 Fed.R.Serv.3d 1026, 122 Ed. Law Rep. 106
 Cheryl SMITH, individually and on Behalf of Brandon SMITH
and Dustin Smith, minors,*
Plaintiff-Appellant,
v.
Karen SEVERN and North Boone Community School District 200,
Boone County, Defendants-Appellees.
 No. 96-1563.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 13, 1996.
Decided Nov. 13, 1997.
 
 George C. Pontikes, Pontikes & Associates, Chicago, IL, April N. Sochan (argued), Bowie, MD, for Plaintiff-Appellant.
 James P. Bartley, Scott F. Uhler (argued), Michele M. McGee, Klein, Thorpe & Jenkins, Chicago, IL, for Defendants-Appellees.
 Before CUDAHY, KANNE and ROVNER, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 A mother, on behalf of her teenage son, claims that his three-day suspension from high school for using a chain saw and a boa constrictor to disrupt a school assembly violated his Constitutional rights of due process and equal protection.
 
 I. FACTUAL HISTORY
 
 2
 In 1994 Brandon Smith was a senior at North Boone High School in Boone County, Illinois. On October 14 of that year Brandon participated in a lip sync[1] contest at North Boone's homecoming school assembly. Prior to the contest, the school officials notified all students that anyone wishing to participate was required to sign up in advance and obtain prior approval for his or her particular lip sync routine.
 
 
 3
 There was an effort in 1994 to increase control over the homecoming lip sync contest because in the fall of 1993, several students engaged in lip sync performances that were determined to be inappropriate for a school assembly (i.e., repeated crotch grabbing and other tasteless conduct). Brandon and several of his friends who participated in the 1993 lip sync performance were disqualified from the contest and were verbally admonished by faculty members at that time.
 
 
 4
 Undeterred by the disapproval of his conduct in 1993, Brandon and some of his classmates decided to participate in the 1994 homecoming lip sync contest--without signing up or obtaining any other form of prior approval. In order to keep their surprise performance unknown to the North Boone administrators and faculty, they concocted a plan. Another group signed up for the lip sync event explaining that they would perform a number from the musical "Grease." While the "Grease" lip sync was in progress, Brandon and friends, disguised by face make-up, body paint, and torn clothing would come from backstage and begin their own lip sync performance, chasing the other group from the stage.
 
 
 5
 The plan was carried out and immediately after taking the stage, Brandon and his friends began their lip sync rendition of "Angel of Death," originally performed by the group "Slayer." In the performance, Brandon and his group made a mock attack on a woman and her child. After the woman was knocked to the ground, Brandon produced a chain saw which he lifted to his groin area in simulation of an erect penis. He then approached the woman and child and pretended to mutilate the woman with the chain saw while his friends joined in beating her with their guitars.
 
 
 6
 Reacting to the performance, teachers attempted to stop it by closing the stage curtain. Brandon was not to be constrained, however, and he came around the partially-closed stage curtain, produced a live boa constrictor and pretended he was going to throw the snake into the assembly audience of students, parents, and faculty.
 
 
 7
 Prior to Brandon's performance, Barb Fedderson, the faculty member responsible for the lip sync contest, was backstage. According to Fedderson, just seconds before the "Grease" lip sync performance began she saw Brandon preparing to take the stage. Because it was only moments before the lip sync was to begin, Fedderson made eye contact with Brandon and told him "don't do anything you'll regret." According to Fedderson she did not see that Brandon had a chain saw or a snake.
 
 
 8
 North Boone school principal Karen Severn was also present at the homecoming assembly. Following Brandon's stage appearance, she decided to call a meeting to evaluate Brandon's conduct. The lip sync contest took place on Friday afternoon, October 14, and Severn contacted Brandon's mother, Cheryl Smith, on Monday, October 17, setting a meeting for the following day, Tuesday, October 18. At the meeting on October 18, a discussion was held involving Severn, Fedderson, Mrs. Smith, and Brandon. A video tape of the lip sync contest was viewed. Fedderson reaffirmed that only moments before Brandon took the stage she had told him "don't do anything you'll regret." Additionally, Brandon and Mrs. Smith were also given the opportunity to ask questions and discuss their version of the incident. At the conclusion of the meeting, Severn told Mrs. Smith and Brandon that she was suspending Brandon for three days for his insubordinate conduct. She determined that Brandon had violated the established rule that all lip sync performers must sign up prior to their participation, and that he had failed to heed Mrs. Fedderson's warning that he should refrain from doing anything that would be in violation of school regulations. Beyond the verbal notice of suspension and articulation of the basis for the action, Severn did not, at that time, give Mrs. Smith or Brandon any written notice that Brandon was being suspended or that Brandon could appeal his suspension.
 
 
 9
 Following the October 18 meeting, Severn sent Mrs. Smith a notice of suspension. The notice provided, in pertinent part, "Brandon is being suspended a half day on October 18 and 19 and a whole day on October 20 and 21, for a total of three days." The reasons listed for the suspension were: 1) disorderly conduct; 2) weapons (identified as the chain saw); 3) insubordination (described as a refusal to obey a request of a teacher); and 4) gang activity (specified as a display of gang symbols). Lastly, the notice had a heading in capital letters entitled "HEARING CONCERNING THIS SUSPENSION." Directly beneath this heading, the notice stated that a parent may request review of any suspension by contacting Severn. The notice further stated that the review of the suspension shall be held by the board of education or its appointed hearing officer and shall be scheduled promptly.
 
 
 10
 In response to this written notice, Mrs. Smith sent Severn a letter in which she stated that she would appeal Brandon's suspension and requested a hearing by the school board "as outlined in the Discipline Code of North Boone High School."[2] The letter further specified that Mrs. Smith was "appealing the suspension itself and the fact that the proper procedure was not followed according to the 'Due process and Appeal Process' outlined in the Disciplinary Code."
 
 
 11
 An appeal hearing was conducted before the school board on January 24, 1995. Among those present at the hearing were Mrs. Smith, her attorney, Brandon, Severn, an attorney representing the North Boone High School, and several student witnesses. Severn testified that prior to the lip sync contest, all students wishing to participate were supposed to sign up and have their performances approved by the event sponsor. According to the testimony of Severn, no faculty member or sponsor had any idea that Brandon and his friends intended to interrupt the lip sync performance to the musical "Grease." Once Severn realized what was occurring on stage, she closed the stage curtain before Brandon and friends could complete their performance.
 
 
 12
 Severn further testified that whenever a student has been suspended that student must make-up the work that was missed while the student was absent. The made-up work is graded and then calculated into that student's grade in each class. A suspension, therefore, is treated as an excused absence in that students are not penalized for their absence, except that they miss the benefits of in-class participation, just as if those students were absent due to illness.
 
 
 13
 This was not Brandon's first suspension in his high school career; in fact, he had been previously suspended on several occasions. During his Senior year he had numerous excused and unexcused absences from school. Nevertheless, this suspension arguably did have some affect on his grades in two classes. In English literature, Brandon missed a movie that the class was required to view and then write a paper based on the content of that film. Brandon, nevertheless, submitted a paper without viewing the movie. His poor performance on this paper resulted in his overall class grade dropping from a B- to a C+. Although Brandon denies ever having the opportunity to see the film, his English Literature teacher, Michelle McShane-Rife, submitted an affidavit stating that Brandon was offered the opportunity to view the film prior to the submission of his paper but made no attempt to do so.
 
 
 14
 Brandon's suspension also affected his grade in his physical education class. Points are awarded in this class for daily participation. No points are awarded when a student is absent, regardless of whether that absence is due to a suspension, illness, or any other reason. As a result of his absence from physical education class, Brandon's lost three days worth of class participation points.
 
 
 15
 Brandon graduated from North Boone High School-but with a federal case pending of purported constitutional dimension.II. PROCEDURAL HISTORY
 
 
 16
 Mrs. Smith turned to the courts to redress these perceived wrongs the three-day suspension visited upon her son. She claims that there was a denial of due process and equal protection rights as guaranteed by the Illinois and Federal Constitutions.[3] The action was initially brought in the Circuit Court of Boone County, Illinois. The case was subsequently removed to the United States District Court for the Northern District of Illinois by Severn and the school board on April 17, 1995. The three count complaint involved two counts brought pursuant to 42 U.S.C. § 1983 (Counts II and III) and a supplemental state claim (Count I).
 
 
 17
 On September 14, 1995, Severn and the school board moved for summary judgment as to Counts II and III.[4] In support of their summary judgment motion, defendants filed several affidavits, a 12(M) statement of undisputed material facts as required by the local rules, and a complete transcript of the school board hearing.
 
 
 18
 At the initial pretrial conference conducted by a magistrate judge on September 15, 1995, Smith was ordered to respond to the defendants' motion for summary judgment by October 13, 1995. A final pretrial conference was set for January 4, 1996. Smith, however, failed to comply with the order directing her to respond by October 13, 1995. Almost three months later, on January 3, 1996 (the day before the final pretrial conference) Smith moved for leave to file a belated response to the defendants' summary judgment motion. At the scheduled pretrial conference on January 4, 1996, the magistrate judge granted Smith leave to file a response to defendants' summary judgment motion. The following day an additional conference was held involving the district judge and counsel. The district judge vacated the magistrate judge's order granting Smith's leave to file the belated response. Nine months later, October 19, 1996, the district judge granted summary judgment in favor of the defendants on Counts II and III (the federal counts) and dismissed Count I (the state count). In deciding the defendants' summary judgment motion the district judge had before him only the supporting information submitted by the defendants.
 
 III. ANALYSIS
 
 19
 A. Smith's Response to the Summary Judgment Motion
 
 
 20
 On appeal, Smith contends that the district judge abused his discretion in vacating the magistrate's January 4 order granting Smith's leave to file responsive pleadings to the summary judgment motion. We review for an abuse of discretion a district court's decision to refuse to grant an enlargement of time to file responsive pleadings to a motion for summary judgment. See Spears v. City of Indianapolis, 74 F.3d 153, 157 (7th Cir.1996). Federal Rule of Civil Procedure 6(b) provides in pertinent part:
 
 
 21
 When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion ... [and] upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect ...
 
 
 22
 In Spears, we went to great lengths to discuss the need for adherence to reasonable deadlines. 74 F.3d at 157. Specifically, we noted that
 
 
 23
 [w]e live in a world of deadlines. If we're late for the start of the game or the movie, or late for the departure of the plane or the train, things go forward without us. The practice of law is no exception. A good judge sets deadlines, and the judge has a right to assume that deadlines will be honored. The flow of cases through a busy district court is aided, not hindered, by adherence to deadlines.
 
 
 24
 Id. In the present case, Smith's responsive pleadings to the motion for summary judgment were not just a few days late. Rather, her responsive pleading was a few months late. Moreover, Smith's request for leave to file a belated response came the day before the scheduled final pretrial conference of January 4, 1996. The district judge acted immediately on reviewing the magistrate judge's decision and determined that the timing of Smith's request was unacceptable. The district judge vacated the magistrate judge's order approving Smith's motion for leave to file a response to the defendants' motion for summary judgment. We agree with the district court's position and re-emphasize that "courts should be mindful that the rules are 'intended to force parties and their attorneys to be diligent in prosecuting their causes of action.' " Id. (quoting Geiger v. Allen, 850 F.2d 330, 331 (7th Cir.1988)). Smith has offered no good reason for the delay in filing her responsive pleadings, and therefore, we find that no abuse of discretion with the district judge's determination.
 
 
 25
 B. The District Court's Grant of Summary Judgment
 
 1. Standard of Review
 
 26
 Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We review grants of summary judgment de novo. See Wallace v. Batavia Sch. Dist. 101, 68 F.3d 1010, 1011 (7th Cir.1995) (citing Cornfield by Lewis v. Consolidated High School Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir.1993)). "The nonmoving party cannot rest on the pleadings alone, but must identify specific facts to establish that there is a genuine triable issue." Cornfield, 991 F.2d at 1320. Smith must make a showing sufficient to establish any essential element of her cause of action for which she will bear the burden of persuasion at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). She also must show that there is more than mere metaphysical doubt as to the material facts. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). If we cannot find evidence sufficient to sustain a jury verdict in favor of Smith, we will affirm the district court's grant of summary judgment. See Cornfield, 991 F.2d at 1320.
 
 
 27
 Generally, in reviewing a motion for summary judgment, we view the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir.1995). However, if the non-moving party fails to file a Rule 12(N) statement, the district court may properly treat the non-moving party's failure to contest the moving party's 12(M) statement of uncontested facts as a binding admission of those facts. No. Dist. Ill. Local Gen. R. 12(N);[5] See Midwest Imports Ltd. v. Coval, 71 F.3d 1311, 1317 (7th Cir.1995); Johnson v. Gudmundsson, 35 F.3d 1104, 1108 (7th Cir.1994). As a penalty, the court will "depart from [its] usual posture of construing all facts in favor of the non-moving party." Johnson, 35 F.3d at 1108; see also Feliberty v. Kemper Corp., 98 F.3d 274 (7th Cir.1996); Midwest Imports, 71 F.3d at 1313. Instead, the court will refuse to consider any facts contradicting the 12(M) statement as not properly before it and will view the 12(M) statement and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See Midwest Imports, 71 F.3d at 1313. In other words, Rule 12(N) penalizes the nonmoving party by limiting the scope of facts a court may take into account in determining whether a genuine issue of material fact exists and whether "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). It does not, however, alter the manner in which a court evaluates those facts.
 
 
 28
 The standard boilerplate for this review is that on summary judgment the inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); see also Matsushita, 475 U.S. at 588, 106 S.Ct. at 1356-57; First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 280, 88 S.Ct. 1575, 1588, 20 L.Ed.2d 569 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir.) (quoting Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir.1993) (collecting cases)), cert. denied, --- U.S. ----, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986). Reducing the pool from which these inferences may be made does not change this maxim of our jurisprudence.
 
 
 29
 Here, Smith defaulted on filing a response to defendants' motion for summary judgment, and no 12(N) statement of contested issues of fact is a part of this record. Therefore, we accept as true the uncontested facts put forth by Severn and the school board in their 12(M) statement, and we construe those facts and the inferences drawn therefrom to determine whether summary judgment is appropriate in this case. See Fed.R.Civ.P. 56(e).
 
 
 30
 2. Existence of Genuine Issues of Material Fact
 
 
 31
 Nevertheless, Smith asserts that genuine issues of material fact do exist based on the testimony in the transcript of the school board hearing submitted by the defendants in support of their summary judgment motion. Only two of Smith's claims of disputed issues of fact merit discussion.
 
 
 32
 Smith asserts that there is a genuine issue of material fact about whether Fedderson, or any other teacher, was aware of the contents of Brandon's lip sync skit prior to the actual performance. Severn testified at the hearing that faculty members were not aware that Brandon and his friends were going to interrupt the "Grease" lip sync to perform their "Angel of Death" lip sync.
 
 
 33
 Smith, however, argues that other testimony from the hearing transcript discloses that Fedderson and Mrs. Redburn, another faculty member, were aware of the contents of Brandon's lip sync skit in advance of his performance. Specifically, Smith cites the testimony of former North Boone High School student Krista Geark, who was a participant in the "Grease" lip sync. According to the transcript, when Geark was asked if she had a conversation with Fedderson concerning Brandon's plan to interrupt the "Grease" lip sync Geark replied "I spoke up and told her what we were going to do." Furthermore, Geark stated that "I even had a conversation with ... Mrs. Redburn, and I told her what we were going to do." Smith contends that Geark's testimony in the transcript creates a genuine issue of material fact, and therefore, the district court's grant of summary judgment was improper. We disagree.
 
 
 34
 An issue of fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Newell v. Westinghouse Elec. Corp., 36 F.3d 576, 578 (7th Cir.1994) (citing Anderson, 477 U.S. at 248, 106 S.Ct. at 2510). Geark's statements are far too vague for any reasonable factfinder to conclude that her statements could support a judgment in Smith's favor. For example, Geark's conclusory statement to Fedderson "I spoke up and told her what we were going to do" offers no insight whatsoever as to what Geark actually told Fedderson. A party "may not defeat a properly focused motion for summary judgment" by relying on evidence that is "less than significantly probative." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). To state it differently, a party will be successful in opposing summary judgment only when they " 'present definite, competent evidence to rebut the motion.' " Id. (quoting Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir.1991)). The testimony of Geark does not provide definite competent evidence to rebut the statement that no faculty member had advance notice of Brandon's unauthorized skit. Accordingly, we find that Geark's statements at the school board hearing create no genuine issue of fact.
 
 
 35
 Smith also claims that a genuine issue of material fact exists as to whether Severn actually told Smith and her son Brandon during their October 18, 1994 meeting, that one reason for Brandon's suspension was for his insubordinate conduct at the lip sync contest. In both her school board hearing testimony and her affidavit supporting the motion for summary judgment. Severn states that she 1) disqualified and verbally reprimanded Brandon one year earlier for his performance at the 1993 lip sync contest due to conduct that was, "beyond the bounds of good taste"; 2) brought Mrs. Fedderson to the October 18 meeting to reiterate that fact that she told Brandon "don't do anything you'll regret" just moments prior to Brandon's taking the stage; 3) played the videotape of Brandon's lip sync performance; and then 4) told Brandon that he was going to be suspended due to his conduct at the lip sync contest.
 
 
 36
 To demonstrate that a genuine material issue of fact exists, Smith cites her own testimony at the school board hearing. At the hearing, when Smith was asked if she or Brandon were ever given the opportunity to explain their side of the story, Smith replied "[Severn] never told us that [Brandon] was being suspended for anything-weapons was never mentioned, insubordination, disorderly conduct, gang activity were not brought up at that meeting." According to Smith these statements, which contradict those of Severn's, demonstrate genuine issue of material fact.
 
 
 37
 Again, we disagree. "[T]o preclude summary judgment, the non-moving party must show the disputed fact to be material, that is, it must be outcome-determinative under the applicable law. Thus, facts not outcome-determinative ..., though in dispute, may still permit the entry of summary judgment." Wainwright Bank & Trust Co. v. Railroadmens Federal Sav., 806 F.2d 146, 149 (7th Cir.1986). The facts indicate there are at least two ways in which Severn communicated to Smith that Brandon's suspension was based on his insubordinate conduct. First, Severn states that she actually told Brandon that his suspension was based on insubordinate conduct at their meeting--this is the fact that Smith believes is in dispute. However, the record also indicates that the totality of Severn's actions clearly informed Smith that Brandon's suspension was based on insubordinate conduct. For example, it is undisputed that Severn disqualified and verbally reprimanded Brandon one year earlier for his performance at the 1993 lip sync contest due to Brandon's inappropriate conduct. Also undisputed is the fact that Mrs. Fedderson came to the October 18 meeting to reiterate that fact that she told Brandon "don't do anything you'll regret" just moments prior to Brandon's taking the stage. Finally, the videotape of Brandon's lip sync performance was played and Brandon was told that he was going to be suspended due to his conduct at the lip sync contest.
 
 
 38
 Thus, even if there is a dispute about whether Severn actually used the words "insubordinate conduct" in her explanation of her decision to suspend Brandon, we believe that fact is not outcome-determinative, because the remaining evidence, which is undisputed, unquestionably demonstrates that the totality of Severn's actions amply communicated to Smith that Brandon's suspension was based on insubordination. Therefore, there exist no genuine issues of material fact as to the basis for Brandon's suspension.C. The Merits
 
 1. Procedural Due Process
 
 39
 In the halcyon days of the 1970's the case of Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), provided the landmark decision governing procedural due process claims in the context of high school suspensions. In Goss, the Court held that students have both property and liberty interests in attending state-established and state-maintained school systems. See id. at 573-76, 95 S.Ct. at 735-37. Furthermore, the Court took great pains to determine the minimal process due a student who is suspended for ten days or less. As had been acknowledged in other due process contexts, the Court recognized that a deprivation of life, liberty or property requires, at the very least, prior notice and an opportunity to be heard in a manner appropriate to the nature of the case. See id. at 579, 95 S.Ct. at 738 (citing Mullane v. Central Hanover Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). Specifically, in the case of a possible suspension of 10 days or less, due process requires that the "student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Id. at 581, 95 S.Ct. at 740.
 
 
 40
 As for the timing of the notice, no delay is necessary between the time notice is given and the time of the discussion with the student. Goss, 419 U.S. at 582, 95 S.Ct. at 740. In being given an opportunity to explain his side of the facts at the discussion, the student must "first be told what he is accused of doing and what the basis of his accusation is." Id. Furthermore, because these discussions often occur immediately after the student's misconduct, "it follows that as a general rule notice and hearing should precede removal of the student from school." Id. The Court also noted however, that there are some situations (i.e. those posing continuing danger to persons or property) where prior notice and hearing cannot be insisted upon. See id.
 
 
 41
 At the October 18 meeting, Severn notified Mrs. Smith and Brandon that Brandon was being suspended for his insubordinate conduct. His name was not on the lip sync sign-up list, Fedderson had warned Brandon not to participate in the lip sync if he intended to violate school rules. Additionally, Severn played the videotape of Brandon's lip sync performance and then told Mrs. Smith and Brandon that he was being suspended for his actions. Finally, Severn then asked for, and received, Mrs. Smith's and Brandon's version of the incident.
 
 
 42
 The notice and hearing procedures undertaken by Severn comported with the due process requirements set forth in Goss. The disciplinary code, a copy of which Smith possessed and which had been discussed with all students at the start of the school year, defines insubordination as "refusal to obey a school rule, regulation, or reasonable request of a teacher or school official." Based on this definition, of which Brandon had been apprised via the disciplinary code, combined with Fedderson's statement to Brandon "don't do anything you'll regret" and Severn's playing of the videotape, we believe that both Mrs. Smith and Brandon had notice of what Brandon had done and what violation of the disciplinary code had resulted. Furthermore, Brandon was given a pre-suspension hearing in which Mrs. Smith and Brandon were allowed to give their version of the event. As Goss indicates, this is all procedural due process requires in the school disciplinary context where, as here, the discipline involved is a suspension of 10 days or less.
 
 
 43
 This suspension procedure was not negated or undermined by Severn's subsequent written notice that included additional charges and reasons for suspension. Due process is satisfied as long as Mrs. Smith and Brandon were given pre-suspension notice of a proper charge and the conduct that supported that charge. The fact that Severn later identified additional charges under the disciplinary code is of no consequence because she had previously identified at least one proper charge (insubordination) upon which Brandon's suspension was invoked.
 
 
 44
 Nor does it matter that these additional charges were considered by the school board in upholding Brandon's suspension. Due process does not require review by a school board. It only requires the initial pre-suspension notice, which we have already determined that Severn provided. The completely gratuitous review by the school board neither is required by due process nor gives rise to any due process rights. Even if it did, due process was complied with as Mrs. Smith and Brandon received prior written notice of the additional charges and a hearing on those charges, including participation by their attorney.
 
 2. Equal Protection
 
 45
 An equal protection violation occurs only when different legal standards are arbitrarily applied to similarly situated individuals. See Del Vecchio v. Illinois Dept. of Corrections, 31 F.3d 1363, 1386 (7th Cir.1994). The fundamental rights strand of equal protection jurisprudence recognizes established constitutional rights and makes certain that those rights receive "no less protection than the Constitution itself demands." Shapiro v. Thompson, 394 U.S. 618, 642, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600 (Stewart, J., Concurring).
 
 
 46
 The question of whether a public education is a fundamental right is not a novel one. In another 1970's decision, San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Court held that in determining which rights are fundamental, the task is to determine whether the claimed right is "explicitly or implicitly guaranteed by the Constitution." Id. at 33-34, 93 S.Ct. at 1297. Next, the Court determined that the right to an education was not guaranteed, either explicitly or implicitly, by the Constitution, and therefore could not constitute a fundamental right. See id. at 35-37, 93 S.Ct. at 1297-99. See also Pontarelli Limousine, Inc. v. City of Chicago, 929 F.2d 339, 342 (7th Cir.1991) (noting that the Supreme Court is unwilling to accord education fundamental right status).
 
 
 47
 Absent either a fundamental right or a suspect class, a court need only apply a rational basis to review the challenged state action. See Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566-67, 49 L.Ed.2d 520 (1976); Scariano v. Justices of the Supreme Court of Indiana, 38 F.3d 920, 924 (7th Cir.1994). Under the rational basis test, a state action is entitled to a presumption of validity. See Scariano, 38 F.3d at 924. We will therefore not disturb a particular state action as long as it is rationally related to a legitimate government interest. See id.
 
 
 48
 In the present case, there is, without a doubt, a rational basis to support Severn's decision to suspend Brandon. Brandon was not similarly situated to the other students who participated in the lip sync because: 1) he had been disqualified and admonished for his inappropriate performance in the 1993 lip sync contest; 2) he ignored the express warning of Fedderson not to break school rules moments prior to his taking the stage; 3) he was the only student to bring a live boa constrictor and chain saw to school that day; and 4) he was the only student who wielded a chain saw in a sexually explicit manner and then proceeded to use the chain saw to graphically depict the mutilation of a woman with her child. There is simply no other evidence in the record to show that any other student ever engaged in conduct similar to Brandon's at lip sync contest. Accordingly, Severn was free, within reason, to fashion a remedy appropriate to the particular circumstances.
 
 IV. CONCLUSION
 
 49
 Given the facts presented in this case, it is inconceivable how a claim could be made that Brandon was not afforded his constitutional right of due process. He was put on notice of his conduct that was deemed to be improper; he was presented with the evidence against him; and, he had an opportunity to tell his side of the story. The requirements of Goss were plainly complied with. In real-life terms there simply could have been no confusion that Brandon's deliberately outrageous conduct prompted the school to take disciplinary action. To argue that Brandon was not on notice as to what he had done to violate school policy is plainly frivolous. Moreover, he so distinguished himself by his conduct that there can be no rational argument that he was denied his equal protection rights.
 
 
 50
 This litigation, based on the wholly unremarkable disciplinary action of a modest suspension which was preceded by entirely appropriate constitutional safeguards, has now required the extensive work of a magistrate judge, a district judge, and three court of appeals judges--not to mention the labors of the lawyers involved. Something has gone badly wrong when the scarce judicial resources of the federal courts are brought to bear on a case which has so little merit as this one. This is the type of case that trivializes the work of the courts and the Constitution we seek to interpret. Moreover, these cases divert judicial energy from litigants who have serious and valid claims.
 
 
 51
 Sanctions were not sought in this case, so we take no action in that regard, but in our view, this type of suit exemplifies the frivolous litigation that Federal Rule of Civil Procedure 11 and Federal Rule Appellate Procedure 38 are intended to deter.
 
 
 52
 AFFIRMED.
 
 
 
 *
 While the caption of the complaint names Dustin Smith as a party to this suit, there is no mention in the complaint of Dustin Smith or in what manner he was injured at the hands of the defendants-appellees
 
 
 [1]
 Lip sync, short for lip synchronization, is defined as a "recording of sound and photographing of action at separate times but utilizing techniques designed to secure synchrony of sound and action when the two are combined." Webster's Third New International Dictionary 1319 (1986)
 
 
 [2]
 During registration of the 1994-95 school year, North Boone had distributed copies of the new student handbook to all of its students. This new handbook contained the school disciplinary code. Further, because the handbook was new for the 199495 school year, each homeroom teacher went through all of the code's disciplinary standards with his or her students
 The disciplinary code sets forth various conduct which is prohibited and may result in a student's suspension. The student handbook contains introductory language that states in pertinent part: "[t]he following is a list of behaviors which are inappropriate in the classroom, in school corridors, on school property and/or during regular school hours at any school or district-sponsored activity." Among the prohibited behaviors in the handbook are "weapons" and "insubordination." The handbook defines a weapon as "any instrument or substance that can be used to inflict bodily injury." The handbook defines insubordination as a "refusal to obey a school rule, regulation, or reasonable request of a teacher or school official." Furthermore, under the heading "Due Process and Appeal Process" the handbook provides the following:
 As an important part of due process, students must be informed of what is acceptable behavior. In the event a student is accused of a violation of the rules in this Code, the accusation must be made in writing by a witness to the incident and given to the principal prior to the principal meeting with the accused, EXCEPT IN EMERGENCY. Before suspension is imposed, the student(s) involved will be told what inappropriate behavior allegedly had been committed. The student(s) will then have an opportunity to respond to the alleged infraction. The Principal may then make his/her decision concerning the suspension. Any suspension shall be reported immediately to the parent(s) or guardian(s) of such pupil along with a full statement of the reasons for such suspension and a notice of their right to a review, a copy of which shall be given to the school board. Upon request of the parent(s) or guardian(s) the school board or a hearing officer appointed by it shall review such action of the principal. At such review the parent(s) or guardian(s) of the pupil may appear and discuss the suspension with the board or its hearing officer.... During the parent or guardian appeal process, no suspension will take place unless a danger is present of harm of self or to others.
 Additionally, the record reveals that Mrs. Smith had a copy of the 1994-95 student handbook prior to the lip sync contest.
 
 
 [3]
 Although we note that the "Illinois Supreme Court has made clear that the Illinois due process guarantee is not necessarily co-extensive with the federal due process protections," RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1276 (7th Cir.1997), Smith has not demonstrated, and we have not found, any guidance which lead us to believe that due process challenges based on the Illinois Constitution are evaluated any differently than challenges that are based on the federal Constitution. See Stratton v. Wenona Community Unit Dist. No. 1, 133 Ill.2d 413, 141 Ill.Dec. 453, 551 N.E.2d 640 (1990) (using federal notions of due process to decide a state issue)
 Equal protection challenges based on the Illinois Constitution are evaluated under the same standards as the federal Constitution. See Jarabe v. Industrial Comm'n, 172 Ill.2d 345, 216 Ill.Dec. 833, 666 N.E.2d 1, cert. denied, --- U.S. ----, 117 S.Ct. 300, 136 L.Ed.2d 218 (1996).
 
 
 [4]
 Plaintiff also moved for summary judgment as to Count I (the state claims) and defendants filed a cross motion for summary judgment as to the same count. The court denied plaintiff's summary judgment motion as to Count I and dismissed the state claims
 
 
 [5]
 Under the local rules for the Northern District of Illinois, a motion for summary judgment imposes special procedural burdens on the parties. The moving party must supplement its motion papers and supporting memorandum with a statement of undisputed material facts. No. Dist. Ill. Local Gen. R. 12(M). The non-moving party must then supplement its response with a statement of disputed material facts. No. Dist. Ill. Local Gen. R. 12(N). See Feliberty v. Kemper Corp., 98 F.3d 274 (7th Cir.1996)