**Gary HAMNER, Plaintiff,**

v.

**COMMUNITY HOSPITALS OF INDIANA, INC., Defendant.**

No. IP97–1849–C–T/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 31, 2000.

Steven T Fulk, Fulk & Associates, Indianapolis, IN, for plaintiff.

Michael Marine, Ice Miller Donadio & Ryan, Indianapolis, IN, for defendant.

## ENTRY DISCUSSING PENDING MOTIONS

TINDER, District Judge.

This matter comes before the court on two motions: (1) Defendant's Motion for Summary Judgment (both as to Plaintiff's claim for retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203, and as to Plaintiff's state law defamation claim), and (2) Plaintiff's Motion to Strike Defendant's Reply to Plaintiff's Revised Response to Defendant's Statement of Material Facts ("Plaintiff's Motion to Strike"). After considering the motion and the submissions of the parties, the court finds as follows.

### I. Background Facts

In 1993, Plaintiff, Gary Hamner, began working at St. Vincent Hospital as a mental health clinician. In October 1995, as part of a "training collaboration program" between St. Vincent and Defendant Community Hospitals of Indianapolis, Inc. ("Community"), Mr. Hamner began working at Community North Hospital, a branch of Community. Mr. Hamner was certified as a Registered Nurse ("RN") in mid-December 1995.

On January 18, 1997, Mr. Hamner was working as an RN in the Acute Adult Psych Department at Community North Hospital. On that date, another nurse called Mr. Hamner for assistance in deal-

ing with a patient (who will be referred to as "D.J.") who had been found lying nonresponsive on the floor. The patient was HIV positive. Mr. Hamner and other staff members attempted to resuscitate the patient, but they did not succeed and the patient died.

Mr. Hamner's immediate supervisor, Susan Duhn, requested a follow-up report of the incident, and on January 22, 1996, Mr. Hamner presented his report to Ms. Duhn. The report detailed what Mr. Hamner felt were the problems with the response to the emergency and the precautions taken prior to the event. He stated that the nurse who first found the patient had performed poorly, and he the pharmacist's lack of response to the emergency. The report detailed the problems with the stocking of the "code-cart," which carries equipment to be used for emergencies. He stated that some of the equipment was faulty and broken and he said the cart did not contain an "ambu bag," which is required for providing mouth-to-mouth resuscitation on any patient. He concluded in his report that the equipment problems possibly contributed to the patient's death.

On January 28, 1996, six days after receiving Mr. Hamner's report, Community terminated Mr. Hamner's employment.

On August 4, 1997, Mr. Hamner filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On August 20, 1997, Mr. Hamner received his right to sue notice from the EEOC, and filed the instant action on November 17, 1997. In his Complaint, Mr. Hamner alleges retaliation under the ADA, and state law defamation.

Other facts will be discussed below, particularly facts related to the allegation that Mr. Hamner measured the penis of a patient. No matter where they are discussed, all facts are construed in the light most favorable to Mr. Hamner.

## II. Discussion

### A. Plaintiff's Motion to Strike

Mr. Hamner moves to strike all of Community's replies to his responses to Community's statement of material facts on the grounds that replies to statements of material facts are not permitted by Southern District of Indiana Local Rule 56.1. He also moves to strike certain replies on the grounds that they contain legal and factual argument, in contravention of Local Rule 56.1.

The court has addressed Mr. Hamner's concerns in an exhaustive fashion in *Pike v. Caldera*, 188 F.R.D. 519 (S.D.Ind.1999), and the court will not repeat that discussion here. The court notes, however, that many of Community's submissions pursuant to Local Rule 56.1 are outside of the spirit, if not the text, of the rule. For instance, some of the submissions contain extensive legal and factual argument—both of which are outside the bounds of what the Local Rule permits. *See* S.D. IND. L.R. 56.1(f)(2). However, it does not appear that Community made its arguments for an improper purpose (such as skirting the reply brief page limits). Instead, many of its reply submissions appear to have been made in lieu of making factual arguments in the reply brief or formal objections in a motion to strike. As discussed in *Pike*, while the court does not condone or prefer such submissions, the court also will not strike them outright in a case such as this, where the submissions do not evidence a bad faith purpose and were submitted only six months after the effective date of the new Local Rule 56.1. Therefore, Mr. Hamner's Motion to Strike is **DENIED**.

### B. Motion for Summary Judgment

### 1. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A "material fact" is one that may affect the decision, so that the finding of that fact is relevant and

necessary to the proceedings. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *See id.; Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994).

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has supported the motion as provided by Fed. R. Civ. P. 56(c), the party opposing the motion must come forward with evidence directed to specific facts showing that there is a genuine issue for trial. *See Duff v. Marathon Petroleum Co.*, 51 F.3d 741, 744 (7th Cir. 1995). When considering a motion for summary judgment, the court must view the facts, and all the inferences drawn from those facts, in the light most favorable to the nonmovant. *See Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 426 (7th Cir.1997); *Frey v. Fraser Yachts*, 29 F.3d 1153, 1156 (7th Cir.1994).

## 2. Retaliation

Community moves for summary judgment as to Mr. Hamner's retaliation claim under the ADA, arguing that Mr. Hamner cannot state a prima facie case of retaliation because he cannot demonstrate that he engaged in protected activity under the ADA.

"The ADA is a broadsweeping protective statute requiring the elimination of discrimination against individuals with disabilities." *Talanda v. KFC Nat'l Management Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (citing 42 U.S.C. §§ 12101–213); *Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1058 (7th Cir.1998). The ADA prohibits acts of retaliation against employees who oppose

the discriminatory practices of employers: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

> An employee demonstrating a prima facie case of retaliation under the ADA ... must establish that (1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action. If the employee is successful at that level, to prevail ultimately he must also rebut the defendants' nondiscriminatory reasons for the adverse action and establish that a discriminatory motive was the determining factor behind the defendants' action.

*Talanda*, 140 F.3d at 1095–96 (quotations and citations omitted); *see also Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998).[1]

Community argues that Mr. Hamner cannot state a prima facie case of retaliation because he cannot demonstrate that he engaged in protected activity under the ADA. Mr. Hamner responds that his complaints about the treatment D.J. (who was HIV-positive) received from Community was protected activity under the ADA.

Community attacks Mr. Hamner's contention with two arguments: (1) Community did not, and reasonably could not have understood that Mr. Hamner's complaints were directed toward conduct prohibited by the ADA; and, (2) Mr. Hamner's subjective belief that he was opposing unlawful discrimination against an HIV-positive patient was not objectively reasonable.

A basic requirement to establishing a prima facie case of retaliation is that the employer must be aware of the em-

---

1. Mr. Hamner does not present direct evidence of retaliation, but instead attempts to     discharge his burden through the indirect method.

ployee's statutorily protected expression before the adverse action is taken against the employee. *See Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1458 (7th Cir.1994). Although the Seventh Circuit has not addressed this issue, the Second Circuit has held that "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by [the statute]." *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 292 (2nd Cir.1998). The court is persuaded that this is an appropriate requirement. Seventh Circuit case law teaches that employers are generally free to fire employees for any reason, or no reason, so long as the reason is not prohibited by statute. *See, e.g., Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1035 (7th Cir.1999) (citing *Debs v. Northeastern Ill. Univ.,* 153 F.3d 390, 396 (7th Cir.1998)). Therefore, if the employer did not, and reasonably could not have understood that the plaintiff's opposition was directed at conduct prohibited by the ADA, then an employer's discharge of the employee for such opposition should fall within the protective umbrella of that general rule that "an employer may fire an employee for any reason at all, as long as the reason does not violate a Congressional statute." *Kahn v. Secretary of Labor,* 64 F.3d 271, 280 (7th Cir.1995).

■ Community correctly points out that in the written "Nursing Follow-up Report" submitted by Mr. Hamner after the code incident involving D.J. Mr. Hamner did not say anything that could reasonably be construed as a complaint that Community mistreated D.J. because he was HIV-positive. (Def.Ex. 13.) However, in his deposition, Mr. Hamner testified that he submitted *another* report to Ms. Duhn after the code incident that "was an information guide to say this is what happened, this is what went wrong, these are the things that were broken on the code cart." (Hamner Dep. at 68.) Mr. Hamner elaborated further on the contents of this second report:

It said in essence that the ... code cart was deficient, the EKG lead was broken, we couldn't get a strip. We couldn't get the man oxygen because there was no wrench to open the oxygen, there was no ambu bag, there was much—there was discussion about the fact that the pharmacist did not come to the code. He sent techs that were not capable of helping the way you need people to help in a code. I believe I stated that Carol Tibbs, who was the first nurse on the scene, should have initiated the code, should have initiated CPR on her own, which she did not do. They yelled for me and I was in the back with another patient and I came forward, ran in the room and immediately started CPR. I felt that there was no way that patient could have been saved. We did not have what we needed to work with, and it was strictly an informative let's be sure this never happens again, because in a psych unit we could have someone have a heart attack, and as an ALCS nurse, you need to be able to save people in that situation.

(*Id.* at 69.) Although this second report clearly contained criticisms of Community and its staff, there is nothing in Mr. Hamner's description of the contents of the report (the actual report has not been entered into evidence and apparently has not been located by either Community or Mr. Hamner) that would have reasonably led Community to understand that Mr. Hamner's complaints were "directed at conduct prohibited by [the ADA]." In other words, he never indicated to Community that he believed that the deficient code cart or the pharmacist's or Ms. Tibbs' poor response to the situation was due to the fact that the patient was HIV-positive. Indeed, his description of the contents of the report does not even include the fact that the patient was HIV-positive. Instead, the report, by Mr. Hamner's own description, was written so that in the future the hospital would respond better to "someone hav[ing] a heart attack".

However, after Community filed its summary judgment motion (and over a year after having his deposition taken), Mr. Hamner submitted an affidavit stating,

[i]n that [second] report I informed Duhn that the ... Unit was not properly equipped to handle the emergency situation with the cardiac AIDS patient that arose in our unit, specifically stating that the staff who responded first to the patient were not attempting to resuscitate the patient, and complaining that the patient had received discriminatory treatment because of his disability.

(Hamner Aff. ¶ 9.) Certainly, if the second report complained "that the patient had received discriminatory treatment because of his disability", this would be sufficient to satisfy the requirement that the employer understood, or reasonably could have understood, that Mr. Hamner's opposition was directed at conduct prohibited by the ADA.

However, the affidavit comes close to contradicting, rather than merely supplementing, his earlier deposition testimony.

It is a well-settled rule of this Court that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition, and, in turn, defeat a defendant's motion for summary judgment.... Thus, when a conflict arises between a plaintiff's own sworn deposition and his sworn affidavit, the deposition testimony overrides statements made in the affidavit.... [S]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment. When a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question

was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.

*Piscione v. Ernst & Young, L.L.P.,* 171 F.3d 527, 532–33 (7th Cir.1999) (quotations and citations omitted); *see also Russell v. Acme–Evans Co.,* 51 F.3d 64, 67 (7th Cir. 1995) ("We have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit.") (citations omitted). Mr. Hamner offers no explanation for why his memory concerning the contents of the second report (which seemed fairly exhaustive in his deposition) became much better over a year after his deposition.[2] However, the court need not dwell on the issue of whether his subsequent affidavit contradicts his deposition testimony, because Community's next argument is meritorious.

Community argues that Mr. Hamner's subjective belief that he was opposing unlawful discrimination against an HIV-positive patient was not objectively reasonable.

It is a well-established principle that, to receive protection under the ADA, a plaintiff must have acted in good faith and with a reasonable and sincere belief that he or she is opposing unlawful discrimination. Specifically, in retaliation cases, whether under Title VII or the ADA, it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry.

*Talanda,* 140 F.3d at 1096 (quotations and citations omitted); *see also Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1147 (7th Cir.1997) ("In order to demonstrate a case of retaliatory discharge, a plaintiff must show that she opposed conduct prohibited by [statute], or at a minimum that she had a 'reasonable belief' she was challenging such conduct."); *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1460 (7th Cir.1995) ("A plaintiff raising a retaliation claim

2. The court should note that while Mr. Hamner skirts the edge of this rule, Community runs squarely afoul of it. On reply, it submits two affidavits that directly contradict the affiant's earlier testimony, without providing any explanation for the sudden about-face. (Com-

pare Meighen Aff. ¶¶ 11–12 *with* Second Meighen Aff. ¶ 6; *compare* Bruce Dep. at 57–59 *with* Bruce Aff. ¶¶ 5–6.) These contradictions relate to issues in the "pretext stage" of the burden-shifting framework, a stage in which the court does not reach.

must have a reasonable belief that she is opposing unlawful discrimination for it seems unlikely that the framers of [the discrimination statute] would have wanted to encourage the filing of utterly baseless charges by preventing employers from disciplining the employees who made them."); *Jennings v. Tinley Park Community Consol. Sch. Dist. No. 146*, 864 F.2d 1368, 1372 (7th Cir.1988) ("The plaintiff need not establish that the action she was protesting was actually an unlawful employment practice; but rather only that she had a reasonable belief that the action was unlawful."); *Little v. United Tech.*, 103 F.3d 956, 960 (11th Cir.1997) ("A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented.").

While it is clear that Mr. Hamner subjectively believed that D.J. received discriminatory treatment because he was HIV-positive (Hamner Dep. at 70–71), Mr. Hamner has failed to produce any evidence that his belief was *reasonable*. Mr. Hamner focuses on his list of complaints about the code incident that were detailed in his second report (the contents of which are stated above). However, he fails to show that the inadequate stocking of the code cart, or the poor responses by the pharmacist and Ms. Tibbs, were in any way caused by D.J. being HIV-positive. For instance, he does not attempt to show that either Ms. Tibbs or the pharmacist even knew that D.J. was HIV-positive. Mr. Hamner did state that after he arrived to the code scene, he "alerted the staff that the patient was HIV-positive." (Def. Ex. 13 at 2.) However, Ms. Tibbs' alleged failure to begin CPR promptly occurred *before* he arrived at the scene. And since the pharmacist was not at the code scene (he instead sent "techs" to the scene), it is difficult to see how Mr. Hamner's "alerting" of the staff at the scene could have played any role in the pharmacist's response.

And finally, Mr. Hamner does not even attempt to explain how the inadequate stocking of the code cart could have been caused D.J.'s HIV-positive status.

Although he does not raise the issue in his brief, Mr. Hamner does state in his affidavit that "I had ... complained to ... staff members that the patient [D.J.] had been discriminated against in that the hospital would not keep him in intensive care, that the psychiatric unit was ill equipped to deal with a patient with his disability, and that patient D.J. received this treatment because of his disability." (Hamner Aff. ¶ 10.) Based upon this statement, it appears Mr. Hamner could be claiming that Community's decision to place D.J. in the psychiatric unit, rather than intensive care, is evidence that his belief that Community discriminated against D.J. is reasonable. If that is indeed Mr. Hamner's argument, and if he has not waived the argument by failing to raise it in his brief, the court finds that Mr. Hamner has not produced sufficient evidence to support it. He states no concrete facts (let alone points to any evidence) indicating that the hospital should have known that D.J. should have been in intensive care. Moreover, he fails to show that the hospital ignored such evidence *because* D.J. was HIV-positive—indeed, in his deposition, Mr. Hamner stated that Community "wouldn't keep [D.J.] in intensive care because he didn't have any money." (Hamner Dep. at 64.) He further does not indicate how he is competent to testify as to where D.J. should have been placed, and as to why he was not placed there.

In short, while a "plaintiff need not establish that the action [he] was protesting was actually an unlawful employment practice", a plaintiff does need to establish that he "had a *reasonable* belief that the action was unlawful." *Jennings*, 864 F.2d at 1372 (emphasis added). Mr. Hamner has failed to make such a showing, and summary judgment is appropriate for Community as

to Mr. Hamner's retaliation claim for that reason.[3] *See Gleason,* 118 F.3d at 1147.[4]

### 3. Defamation

Mr. Hamner alleges that he was defamed by Community employees who stated to third parties that Mr. Hamner measured a mentally-ill patient's penis. In order to analyze Community's summary judgment motion, the court will separate Community's intracompany communications from its communications to those who are not employed by Community.

#### a. Intracompany Communications

In *Bals v. Verduzco,* 600 N.E.2d 1353 (Ind.1992), the Indiana Supreme Court set forth the law in Indiana regarding defamation claims for intracompany communications:

> To accommodate the important role of free and open intracompany communications and legitimate human resource management needs, [a] qualified privilege is available to protect personnel evaluation information communicated in good faith.... Intracompany communications regarding the fitness of an employee are protected by the qualified privilege. A statement otherwise protected by the doctrine of qualified privilege may lose its privileged character upon a showing of abuse wherein: (1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the

defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth.

*Id.* at 1356 (citations omitted); *see also Schrader v. Eli Lilly and Co.,* 639 N.E.2d 258, 261–62 (Ind.1994) (same). Since the qualified privilege is a defense, a defendant has the burden of showing that it is applicable. But "[o]nce the communication is established as qualifiedly privileged, the plaintiff then has the burden of overcoming that privilege by showing that it has been abused." *Id.* at 262 (citation omitted).

In this case, Mr. Hamner names four Community employees that he claims made defamatory statements to other Community employees: Ms. Duhn (Mr. Hamner's immediate supervisor), Deborah Horsman (a Community staff member who claims to have heard Mr. Hamner state that he measured a patient's penis), Roderick Bruce (same), and Tami Skwarcan (a Community human resources representative). (Hamner Dep. at 24, 48, 55–57.) Community asserts that these employees made their communications (involving the alleged penis-measuring incident) in the context of evaluating or commenting upon Mr. Hamner's fitness as an employee, and are therefore protected by the qualified privilege.

In response, Mr. Hamner does not challenge that the qualified privilege applies; instead, he argues that the speakers abused the privilege because they made the statements "with reckless disregard of the truth of the accusations against Mr.

**3.** Since the court finds that summary judgment is appropriate for Community because Mr. Hamner has failed to demonstrate a prima facie case of retaliation, the court does not address Community's alternative argument that summary judgment is appropriate because Mr. Hamner has not produced sufficient evidence to show that Community's proffered reason for his termination was pretextual.

**4.** As the Seventh Circuit stated in *Gleason:*
> In order to demonstrate a case of retaliatory discharge, a plaintiff must show that she opposed conduct prohibited by Title VII, or at a minimum that she had a 'reasonable belief' she was challenging such conduct. Gleason and others did complain about No-

> vak's management style, in general terms. However, Gleason concedes that she did not raise the subject of sexual harassment to anyone in authority (including Novak and McGowan), and she admits that she neglected to follow the company's procedures for reporting sexual harassment. Gleason claims in her deposition testimony that she 'feels' that Novak's objectionable behavior 'encompassed ... sexual discrimination,' but unless she made these 'feelings' known to her employer, they are irrelevant. Based on this record, we hold that Gleason did not engage in statutorily-protected expression or activity prior to her termination and has thus failed to establish the 'protected expression' element of retaliatory discharge.

Hamner" and with "malicious motivations." (Pl.'s Revised Resp. and Br. in Opp'n to Def.'s Mot. for Summ. J. at 19–20.)

However, Mr. Hamner fails to support his arguments with evidence. Both Ms. Horsman and Mr. Bruce have consistently maintained that they each personally heard Mr. Hamner say that he measured a patient's penis in order to reassure the patient that his penis was normal in size. (Horsman Aff. ¶ 4; Horsman Dep. at 29–30; Bruce Aff. ¶ 4; Bruce Dep. at 54.) Mr. Hamner has failed to show that when Ms. Horsman and Mr. Bruce reported to Ms. Duhn what they heard, they were motivated in any part (let alone "primarily" as is required for the privilege to be abused) by ill will. Since Ms. Duhn (and through Ms. Duhn's investigation, Ms. Skwarcan) received reports from two employees stating unequivocally that Mr. Hamner admitted to measuring a patient's penis, as well as reports from three other staff members that (to varying degrees) implicated Mr. Hamner in the incident (Duhn Dep. at 137, 142, 144, 150–52, 166, Exs. 7, 9–11, 19), Ms. Duhn (and Ms. Skwarcan) could not be said to have "recklessly disregarded" the truth in stating that the incident occurred.

■ Although Ms. Duhn never asked the patient in question whether Mr. Hamner measured his penis (and in a subsequent affidavit, the patient said that Mr. Hamner did not), Community has provided a legitimate reason for the failure to ask the patient. In the course of Ms. Duhn's investigation, Ms. Duhn contacted the patient's psychiatrist, Dr. Karen Meighen, to determine if Ms. Duhn should contact the patient about the alleged incident. (Duhn Dep. at 140, 153–54.) Dr. Meighen told Ms. Duhn that it would not be in the patient's best interest to ask him about the incident. (*Id.* at 153–54.) Therefore, Ms. Duhn's failure to ask the patient about the truth of the incident cannot be said to create an issue of fact as to whether Ms. Duhn had no grounds for belief in, or "recklessly disregarded", the truth of whether Mr. Hamner actually measured the patient's penis.[5]

In short, Mr. Hamner has failed to demonstrate an issue of fact as to whether Community abused its qualified privilege for intracompany communications regarding the fitness of Mr. Hamner as an employee due to the alleged penis-measuring incident.

**b. Other Communications**

Mr. Hamner points to communications made by Community employees concerning the alleged penis-measuring incident to two people who were not Community employees, and thus not subject to the protection of the qualified privilege.

■ Ms. Duhn told Althea Albritton, Director of Nursing of Adult Services at St. Vincent Hospital (Mr. Hamner's former employer), that Mr. Hamner "had been terminated for allegedly, measuring a psychiatric patient's penis." (Duhn Aff. ¶ 21.) Because Ms. Duhn used the word, "allegedly", there is no issue of fact as to whether the statement was false.[6] "Defamation rules apply . . . *only* to statements that are *false* as well as defamatory." *Doe v. Methodist Hosp.,* 690 N.E.2d 681, 687 (Ind.1997) (emphasis added) (citation omitted).

However, Dr. Meighen, who was not employed by Community, stated in an affi-

*Id.* (citation omitted)

**5.** As indicated above, the standard for determining whether a statement loses its privileged character is not, as Mr. Hamner contends, "reckless disregard"; the relevant standard is "the statement was made without belief or grounds for belief in its truth." *Bals,* 600 N.E.2d at 1356.

**6.** Mr. Hamner argues that a reasonable jury could believe that Ms. Duhn did not use the word "allegedly" when speaking with Ms. Albritton because Ms. Duhn did not use that word when she wrote Mr. Hamner's formal discharge notice. The court finds that Ms. Duhn's failure to use the word "allegedly" in an internal discharge notice does not constitute the kind of inconsistency that creates an issue of fact as to whether Ms. Duhn told the truth when she testified about using the word "allegedly" when talking to someone at a different hospital.

davit that "[t]he morning after the alleged penis measuring incident, staff nurses at Community North informed me that Mr. Hamner had measured a patient's penis." (Meighen Aff. ¶ 13.)· There is an issue of fact as to whether the staff nurses' statement to Dr. Meighen was true.[7] However, Community argues that this statement (as well as all of the other allegedly defamatory statements) are protected by statutory immunity.

### c. Statutory Immunity

■ An Indiana statute provides:

An employer that discloses information about a current or former employee is immune from civil liability for the disclosure and the consequences proximately caused by the disclosure, unless it is proven by a preponderance of the evidence that the information disclosed was known to be false at the time the disclosure was made.

IND. CODE § 22–5–3–1(b). As discussed above, Mr. Hamner has failed to produce evidence that any of the Community employees that made statements about the alleged penis-measuring incident knew that their statements were false at the time they made them. Therefore, it would seem that by the plain words of this statute, Mr. Hamner's defamation claim must fail as a matter of law.

Mr. Hamner attempts to distinguish the statute by arguing that the statute only applies to communications "made in the course of providing information to another potential employer upon request." (Pl.'s Revised Resp. and Br. in Opp'n to Def.'s Mot. for Summ. J. at 20.) And looking at the one reported case to mention this provision, Mr. Hamner's argument seems to find support. In *Steele v. McDonald's Corp.*, 686 N.E.2d 137 (Ind.Ct.App.1997), the court stated, "Employers and their agents are immune from civil liability for the disclosure of truthful information to subsequent and potential employers." *Id.* at 142 (citing IND. CODE § 22–5–3–1(b)). However, *Steele* involved a case in which an anonymous employee from plaintiff's former employer called plaintiff's current employer and stated that plaintiff was a convicted felon. It is clear from the facts of *Steele*, that, unlike Mr. Hamner's contention, section 22–5–3–1(b) does not require a *request* for the information for the statute's protection to apply. Also, *Steele* teaches that the statute does not require the recipient of the information to be a *potential* employer. Moreover, any limitation in the scope of IND. CODE § 22–5–3–1(b) that can be read into the language of *Steele* is not necessary to the holding of the case, and thus constitutes dictum.

In looking at the other provisions of IND. CODE § 22–5–3–1, it is clear that the Indiana legislature knew how to insert limiting language when it so desired.[8] And since the statute is quite clear and unambiguous on its face, the court will not read in limitations that do not exist in the plain words of the text. Therefore, the court

---

7. Both Mr. Hamner, and the patient whose penis he allegedly measured, deny that the incident ever happened. This testimony is more than sufficient to create an issue of fact as to whether the penis-measuring incident ever happened.

8. The other two provisions of IND. CODE § 22–5–3–1 are as follows:

(a) A person who, after having discharged any employee from his service, prevents the discharged employee from obtaining employment with any other person commits a Class C infraction and is liable in penal damages to the discharged employee to be recovered by civil action; but this subsection does not prohibit a person from informing, *in writing*, any other person *to whom the discharged employee has applied for employment* a truthful statement of the reasons for the discharge.

. . . .

(c) Upon written request by the prospective employee, the prospective employer will provide copies of any written communications from current or former employers that may affect the employee's possibility of employment with the prospective employer. The request must be received by the prospective employer not later than thirty (30) days after the application for employment is made to the prospective employer.

*Id.* (emphasis added).

finds that pursuant to application of IND. CODE § 22–5–3–1(b), Community is entitled to summary judgment as to Mr. Hamner's defamation claim.

## III. Conclusion

The court finds that Community's Motion for Summary Judgment should be **GRANTED**. Mr. Hamner's Motion to Strike is **DENIED**.

All of Mr. Hamner's claims are terminated by this Entry. There is no just reason for delay entering judgment as to those claims, and that will be done pursuant to Federal Rule Civil Procedure 58.