Joan **CAVALIERI–CONWAY,** Plaintiff,

v.

**L. BUTTERMAN & ASSOCIATES,** and individually **L. Butterman,** owner, **Robert Underwood** and **Delores Underwood,** managers, Defendants.

No. 96 C 5631.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 28, 1998.

*sic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir.1997) (discussing Local Rule 12(M) and 12(N)); *Huff v. UARCO*, 122 F.3d 374, 382–83 (7th Cir.1997) (same). In addition, to the extent that they are consistent with these statements, the facts from the court's prior opinion in this action are also adopted. *See Cavalieri–Conway v. L. Butterman & Assocs.*, No. 96–5631, 1997 WL 126987, at * 1–2 (N.D.Ill. March 11, 1997). The court notes that, unlike most pro-se litigants, Plaintiff has attempted to comply with the Local Rules; however, her efforts are not satisfactory. Reluctantly, the court will not strictly apply the Local Rules to Plaintiff's detriment, *i.e.*, deem Defendants' Rule 12(M) statements admitted, *see Smith v. Severn*, 129 F.3d 419, 425–26 (7th Cir.1997), because it is not clear whether she was given adequate notice of the harsh consequences for non-compliance. *See Timms v. M. Frank*, 953 F.2d 281, 285 (7th Cir.1992) (Pro-se plaintiffs are entitled to notice that "any factual assertion in the movant's affidavits will be taken as true unless the nonmovant contradicts the movant with counter-affidavits or other documentary evidence."); *Cabrera v. Peters*, No. 92–4099, 23 F.3d 410 (Table), 1994 WL 164528, at *2 (7th Cir. April 28, 1994); *Prentice v. Information Resources*, No. 96–3819, 1997 WL 159112, at *1 (N.D.Ill. March 27, 1997); *Davis v. Flagstar Companies, Inc.*, No. 95–5582, 1997 WL 725429, at *4 n. 6 (N.D.Ill. Nov.10, 1997); *but see Dillard v. Washington*, No. 95–6282, 1997 WL 305312, at *1 (N.D.Ill. May 29, 1997) (stating that pro-se status is no excuse for noncompliance because "the Local Rules apply to everyone, and litigants … must undertake sufficient investigation to ensure that they comply with the procedural and substantive requirements of the Northern District of Illinois").

Until her eviction in November 1996, Plaintiff, Joan Cavalieri–Conway ("Cavalieri–Conway"), was a tenant of the "Clarkwood" apartment building owned by Defendant, Lewis Butterman ("Butterman"), and managed by Defendants Robert and Delores Underwood. Cavalieri–Conway was 58 years old at the time of her eviction; the age of each Defendant ranged from 65 to 70. Dur-

Joan Cavalieri–Conway, Chicago, IL, pro se.

Mark B. Butterman, Franklin S. Schwerin, Richard T. Reibman, Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for Defendants.

## OPINION AND ORDER

NORGLE, District Judge.

Before the court are cross motions for summary judgment. For the following reasons, Defendants' motion is granted and Plaintiff's motion is denied.

## I. BACKGROUND

As a preliminary matter, the undisputed facts for this opinion are taken from the court's reconciliation of the parties' Local Rule 12(M) and 12(N) statements. *See Bra-*

ing her tenancy, Cavalieri–Conway paid $380 a month in rent, well below the market value of $500 for surrounding apartments in the Lincoln Park area. Although her rent was apparently a bargain, Cavalieri–Conway had several run-ins with management. For instance, in August 1994, Cavalieri–Conway took Defendants to court to recover past due interest on her security deposit in the amount of $8.75. In another incident in November 1995, Cavalieri–Conway wrote a letter to Butterman alleging that Robert Underwood made objectionable statements to her about her sexual activity in 1992.

In March 1996, Butterman notified Cavalieri–Conway that he would not renew her lease at the expiration of its term on April 30, 1996. Upon her lease's expiration, however, Cavalieri–Conway refused to vacate the apartment. On May 11, 1996, Butterman brought an action in state court for possession. Cavalieri–Conway then counterclaimed, alleging retaliatory eviction in violation of the City of Chicago Municipal Code.

The parties reached a settlement on July 8, 1996. Under that agreement, Cavalieri–Conway was to pay L. Butterman & Associates $380 on or before September 1, 1996, and was to vacate the premises on or before October 1, 1996. That $380 was the only rent that Cavalieri–Conway was required to pay from the expiration of her lease on April 30, 1996, until her agreed-upon departure on October 1, 1996. Cavalieri–Conway did not vacate the apartment on October 1, 1996. Consequently, on November 13, 1996, the Cook County Sheriff's Department forcibly evicted her.

Although their agreement contained a paragraph stating that the parties desired to fully settle all claims to avoid litigation, Cavalieri–Conway filed a pro-se complaint in federal court against Defendants on September 5, 1996. Cavalieri–Conway claims that Defendants made the settlement to avoid civil rights liability (Am. Compl. at 3)[1] and that she only agreed to it because she was distracted by other litigation to which she was involved[2] (Pl.'s Br. in Supp. at 14a). She states that the instant case:

> is a belated lengthy legal battle in which Lewis Butterman allows to endure to keep the Plaintiff in an environment of economic persecution.... This is a series of unlawful transactions and [Defendants] acted to further the goals of 'covert Darwinism' and male superiority through surveillance and control imposed by Robert and Delores Underwood and Lewis Butterman through the granting of an option to renew the lease as reward, or in due time, punishment by vacating the unit of the eviction process.

(Am. Compl. at 11.)

As amended,[3] Cavalieri–Conway's complaint alleges: 1) Sexual discrimination and harassment in violation of the Fair Housing Act, 42 U.S.C. § 3604; 2) Retaliation in violation of the Fair Housing Act, 42 U.S.C. § 3617; 3) Age discrimination in violation of the Illinois Human Rights Act, 775 ILCS 5/1–101 et seq.; 4) Intentional infliction of

---

1. The court notes that Cavalieri–Conway numbers the pages of her amended complaint with two sets of numbers; one set is typed, the other is handwritten. The court will cite to the handwritten page number, which throughout most of the complaint is two pages less than the typewritten number.

2. Cavalieri–Conway also brought an unsuccessful discrimination action against her former employer. In that litigation, Cavalieri–Conway alleged, among other things, that "she lost her job for opposing granting sexual favors for job benefits." (Am. Compl. at 4); see also Cavalieri–Conway v. State of California, No. 94–6826, 1997 WL 534996 (N.D.Ill. Aug.22, 1997); Cavalieri–Conway v. State of California, Nos. 94–6826, 94–7776, 1996 WL 65997 (N.D.Ill. Feb. 12, 1996).

3. Though Cavalieri–Conway was given the opportunity to amend her complaint, it remains rambling and disjointed. Similarly, throughout her voluminous pleadings, Cavalieri–Conway attempts to invoke several legal theories without a sound legal or factual basis. Moreover, she repeatedly and aimlessly attempts to mold and adjust her factual allegations so they are consistent with a certain legal theory. Nevertheless, because Cavalieri–Conway is a pro-se litigant, the court has made every effort to discern the factual allegations and causes of action which underlie her complaint. On the same token, however, "[a]lthough pro-se complaints enjoy a liberal interpretation, a pro-se litigant does not escape the essential burdens necessary to avert summary judgment." Cabrera v. Peters, 23 F.3d 410 (Table), 1994 WL 164528, at *2 (7th Cir. 1994).

emotional distress, and 5) Intentional interference with business or economic relationships.

In addition to her complaint in federal court, Cavalieri–Conway filed complaints with two government agencies. In September 1996, Cavalieri–Conway filed a complaint with HUD that accused Defendants of sexual discrimination. On December 12, 1996, HUD issued a Determination of No Reasonable Cause, dismissing the complaint. On January 2, 1997, Cavalieri–Conway filed a complaint with the State of Illinois Department of Human Rights ("IDHR") that accused Defendants of sexual and age discrimination. Cavalieri–Conway eventually withdrew her allegations of sexual discrimination before the IDHR submitted a ruling. However, with respect to her age discrimination claim, the IDHR concluded that there was a lack of substantial evidence to support her allegations.

Each party now moves for summary judgment on Cavalieri–Conway's remaining complaint in federal court. Defendants argue that Cavalieri–Conway has provided no evidence in support of her allegations and that she "has escalated common landlord/tenant concerns into full scale federal litigation," (Defs'.Mem. in Supp. at 12.) The court notes that though Cavalieri–Conway has filed her own motion for summary judgment, it is a rehash of her opposition to Defendants' motion. In other words, although she requests judgment as a matter of law, Cavalieri–Conway continues to assert that genuine issues of fact exist, and thus her case should go to a jury. Therefore, Cavalieri–Conway's motion is denied outright.

## II. DISCUSSION

### A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is genuine only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Smith v. Severn,* 129 F.3d 419, 426 (7th Cir.1997) (*quoting Newell v. Westinghouse Elec. Corp.,* 36 F.3d 576, 578 (7th Cir.1994)) (citation omitted). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When considering all the evidence presented in a motion for summary judgment, a court cannot make credibility determinations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must "view the record and all reasonable inferences drawn from the record in the light most favorable to the nonmoving party." *Sample v. Aldi, Inc.,* 61 F.3d 544, 546 (7th Cir.1995). "If the non-moving party bears the burden of proof on an issue, that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact." *Id.* at 547. "[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *Severn,* 129 F.3d at 427 (citations and internal quotation marks omitted). The non-moving party, therefore, will not survive summary judgment with merely a scintilla of evidence supporting its position. *Essex v. United Parcel Serv. Inc.,* 111 F.3d 1304, 1308 (7th Cir.1997). "The question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Severn,* 129 F.3d at 427. Accordingly, "if the evidence presented by the parties is subject to conflicting interpretations, or if reasonable minds could differ as to its significance," summary judgment must not be granted. *O'Connor v. Chicago Trans. Auth.,* 985 F.2d 1362, 1366 (7th Cir.1993).

### B. The Fair Housing Act

#### 1. Sexual Discrimination

Cavalieri–Conway alleges that Defendants' refusal to negotiate a new lease and make repairs resulted from sexual discrimination in

violation of § 3604 of the Fair Housing Act ("the FHA").

In relevant part, the FHA makes it unlawful:

> (a) to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling because of race, color, religion, sex, familial status, or national origin;
>
> (b) to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604 (1994).

■ There are two theories of discrimination by which plaintiffs may proceed under the FHA: (1) disparate treatment; and (2) disparate impact. *Phillips v. Hunter Trails Community Assoc.*, 685 F.2d 184, 189–90 (7th Cir.1982); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir.1996); *Doe v. City of Butler*, 892 F.2d 315, 323 (3rd Cir. 1989). Here, the court construes Cavalieri–Conway's amended complaint as alleging only disparate treatment, *i.e.*, intentional discrimination. (Am. Compl. at 5, 16), *see also Hispanics United of DuPage County v. Village of Addison, Ill.*, 988 F.Supp. 1130, 1151 (N.D.Ill. 1997) ("whether a particular case warrants relief under [the FHA] in the absence of intent is a matter committed to the court's discretion, based on assessing the facts before it.") (*citing Metropolitan Housing Devel. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1289–90 (7th Cir. 1977)); *United States v. Branella*, 972 F.Supp. 294, 298 (D.N.J.1997) ("In the absence of any representation that Plaintiff seeks recovery based on the disparate impact theory, the court must conclude that only an intentional discrimination claim could lie....").

■ The elements of an action alleging housing discrimination parallel the elements for an action alleging employment discrimination under Title VII. *See Kormoczy v. Secretary, U.S. Dept. of HUD.*, 53 F.3d 821, 823–24 (7th Cir.1995) (applying Title VII analysis to housing discrimination claim based on familial status); *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir.1997) (applying Title VII analysis to housing discrimination based on disability); *Dahlstrom v. Dept. of Corrections*, No. 92–5454, 1995 WL 562050, at *7 (N.D.Ill. Sept. 21, 1995) (applying Title VII analysis to sexual discrimination claim under the FHA).

■ Thus, to survive summary judgment on a disparate treatment claim, Cavalieri–Conway may establish that Defendants "had discriminatory intent either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden-shifting method known as the *McDonnell Douglas* test." *Kormoczy*, 53 F.3d at 823–24; *but see Hamilton v. Svatik*, 779 F.2d 383, 387 (stating that § 3604 does not require proof of discriminatory intent).[4] "These two methods are distinct evidentiary paths." *Id.* at 824. Because it is unclear under which method Cavalieri–Conway relies upon, the court will apply both approaches. *See, e.g., Huff v. UARCO, Inc.*, 122 F.3d 374, 378 (7th Cir. 1997) (reviewing the district court's application of both approaches); *Oates v. Discovery*

---

4. Despite the apparent conflict between *Kormoczy* and *Hamilton,* the court has interpreted *Hamilton* as stating that proof of discriminatory intent is not required when a plaintiff alleges disparate impact, as opposed to disparate treatment, under § 3604(a) of the FHA. *See Mountain Side Mobile Estates Partnership v. Secretary of H.U.D.*, 56 F.3d 1243, 1250 (10th Cir.1995) ("A claim of disparate impact,[footnote omitted] unlike a claim of disparate treatment, does not require a finding of intentional discrimination."); *see also United States v. Branella*, 972 F.Supp. 294, 298 (D.N.J.1997) ("While the failure to show intent does not defeat an attempt to state a prima facie case of housing discrimina-

tion, [citation omitted], where ... the plaintiff alleges discrimination as a result of disparate treatment—as opposed to disparate impact—a showing of impermissible intent is pivotal"), *Familystyle of St. Paul, Inc. v. City of St. Paul,* 728 F.Supp. 1396, 1401 (D.Minn.1990) ("Proof of discriminatory motive is crucial to a discriminatory treatment claim.") *aff'd* 923 F.2d 91 (8th Cir.1991); *cf. Metropolitan Housing Devel. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1289–90 (7th Cir.1977) (holding that only under "some circumstances a violation of section 3604(a) can be established by showing of discriminatory effect without a showing of discriminatory intent").

*Zone,* 116 F.3d 1161, 1170 (7th Cir.1997) (same).

### a. Direct Method

As noted above, to survive summary judgment using the direct method, Cavalieri–Conway may present either direct or circumstantial evidence of discrimination. *See Wallace v. SMC Pneumatics,* 103 F.3d 1394, 1397 (7th Cir.1997) (noting that a plaintiff can satisfy the direct method through either direct or circumstantial evidence).

 "Direct evidence is that which can be interpreted as an acknowledgment of the defendant's discriminatory intent." *Kormoczy,* 53 F.3d at 824 (*citing Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994)); *see also Huff v. UARCO, Inc.,* 122 F.3d 374, 380 (7th Cir.1997). In other words, a plaintiff brings direct evidence when he presents a "smoking gun" of discriminatory intent. *See e.g., Bahl v. Royal Indem. Co.,* 115 F.3d 1283, 1290 n. 6 (7th Cir.1997) (discussing what constitutes direct evidence of discrimination), *Mojica v. Gannett Co., Inc.,* 7 F.3d 552, 561 (7th Cir.1993) (en banc) (direct evidence where plaintiff testified that supervisor would not be promoted because she was not a black male); *Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424, 425–26 (7th Cir.1992) (stating that an example of direct evidence is where an employer's decision-maker utters discriminatory statements). "[C]ircumstantial evidence is admissible too, to provide a basis for drawing an inference of intentional discrimination." *Troupe,* 20 F.3d at 736. Circumstantial evidence under the direct method comes in two forms:

1) suspicious timing, ambiguous statements, behavior toward or comments directed at [others] in the protected group, and other evidence which an inference of discriminatory intent might be drawn; [or] 2) evidence that [others] similarly situated to the plaintiff other than in the characteristic on which the [defendant] is forbidden to base a difference in treatment (i.e.age, race, sex, etc.) received systematically better treatment.... [5]

*Huff,* 122 F.3d at 374 (*citing Troupe,* 20 F.3d at 736).

In support of her sexual discrimination claim, Cavalieri–Conway asserts that, beginning in 1992, Robert Underwood had a policy of "holding her to a higher moral standard" compared to male tenants. (Am. Compl. at 4.) Specifically, Cavalieri–Conway alleges that Robert Underwood forced her "to abstain from having a sexual partner" as a condition for the rental of her apartment and to get repairs made. (*Id.*) She asserts that on two separate occasions in September 1992, Robert Underwood "discouraged [her] from engaging in sex out of fear of being punished by his deliberate warnings of being called a 'hole' or 'whore' making her living existence under these conditions threatening and demeaning." (*Id.*) Moreover, she accuses Robert Underwood of keeping her under constant surveillance to insure that she was chaste. (*Id.* at 5) According to Cavalieri–Conway, management did not impose these same conditions on male tenants as they were allowed to have overnight guests and sexual partners on a regular basis. (*Id.* at 14)

Cavalieri–Conway also alleges that, in the fall of 1995, she refused to pay "kick-backs" to Delores Underwood of approximately $10.00 at a time for repairs to her apartment (cleaning blinds, repairing oven, fixing a leaking faucet, replacing her door lock with a

---

5. The Seventh Circuit has also recognized a third type of circumstantial evidence: evidence that plaintiff was qualified [in some sense, whether it be employment or housing] in question but was passed over in favor (or replaced by) a person not having the forbidden characteristics and that the [defendant's] stated reason for the difference in treatment is unworthy of belief or, a mere pretext for discrimination. *Huff,* 122 F.3d at 380 (*citing Troupe,* 20 F.3d at 736). However, the Seventh Circuit noted that this third type of circumstantial evidence "is substantially the same as the evidence required in a so-called indirect or *McDonnell Douglas* case...." *Huff,* 122 F.3d at 380; *see also Huff v. UARCO, Inc.,* 925 F.Supp. 550, 560–61 (N.D.Ill.1996) (providing an excellent discussion recognizing that the third type of circumstantial evidence "really seems to be simply a shorthand way of describing the *McDonnell Douglas* burden shifting analysis.") Thus, as in *Huff,* the court will determine separately whether the third type of circumstantial evidence exists. *See* infra.

dead-bolt lock). Cavalieri–Conway claims that these demands were only directed at her because she was female. Furthermore, Cavalieri–Conway asserts that a male tenant with a "superior" apartment was paying $10.00 less a month in rent for a period of six months. Those allegedly superior conditions included an apartment with an unobstructed view, carpet cleaning, and the installation of new carpeting.

In addition to discriminatory conditions, Cavalieri–Conway alleges that Defendants refused to renew her lease because she did not satisfy their "sexual criteria for evaluating a female tenant." (Am. Compl. at 15.) Under this supposed criteria, "either the female was aboard the male hegemony and encouraged/forced to have a sex partner or in the alternative, male sponsorship in housing, or she was on board (ready to be shipped out) and not allowed a sex partner or in the alternative, male sponsorship...." (*Id.*) Cavalieri–Conway also alleges that Defendants have a:

> rigid intolerant mind-set, an archaic [sic], antiquated legalism or orthodoxy about women ... [and] that their anti-women measures are not chiefly encouraged by a hostile public opinion toward women in society lately since Geraldine Ferraro ran for Vice President of the United States against Reagan.... Their swagger and sashay allegations of Plaintiff's bizarre behavior and of a sexual nature are made to strut and parade their phallic peacock procession by the acts of sorting females out into those who need overlords and those who do not. This is based on an Iranian religious thought known as Zarathustra....

(Pl. Resp. at 8.) Finally, Cavalieri–Conway submits a statement by a former colleague who recalled that Cavalieri–Conway "mentioned ... how management of her apartment building was out to get her." (Pl.Aff., Ex. 101.)

■ The court's review of the record indicates that Cavalieri–Conway does not present any direct or circumstantial evidence of sexual discrimination. Outside of her bare accusations, Cavalieri–Conway does not provide any evidence that Defendants imposed restrictive conditions on her whatsoever or that Defendants refused to renew her lease based on her sex. The alleged discrepancy in the amount of rent was only temporary, in that the male tenant's rent was increased by $10 when it was renewed in October 1995. Furthermore, the allegedly superior conditions in the male tenant's apartment were the result of additional covenants negotiated as part of his lease. Cavalieri–Conway does not provide any evidence that those terms were not subject to negotiation for her lease. As for her other allegations, her only "proof" is her subjective impressions of an environment that she perceived to be hostile towards women. *See, e.g., McMillian v. Svetanoff,* 878 F.2d 186, 190 (7th Cir.1989) (plaintiff's subjective beliefs of racial bias are insufficient to create a genuine issue of material fact under Title VII); *see also Rush v. McDonald's Corp.,* 966 F.2d 1104, 1116 (7th Cir.1992) ("inappropriate remarks, standing alone, [do] not raise an inference of discriminatory intent") (citation omitted). Indeed, Cavalieri–Conway even concedes that her allegations are "based on her perception in the context of when the events happened ..." (Pl.12(N), at 3.)

Additionally, Cavalieri–Conway's own admissions undermine her claim of sexual discrimination. *See generally Soo Line R. Co. v. St. Louis Southwestern Ry. Co.,* 125 F.3d 481, 483 (7th Cir.1997) (discussing the significance of a party's admissions in pleadings). For instance, she admits that the "higher moral standard" that Defendants allegedly imposed upon her "was not applied to similarly situated females, who were treated more favorably when allowed to have sexual partners in their rental unit because Robert Underwood viewed them as needing male protection for either financial assistance in renting the unit or not able to live independently." (Am. Compl. at 5.) Moreover, she alleges that Defendants "advocated [sexual partners] for younger females." (Pl. Resp. at 3.)

As for her allegation that Defendants would not make repairs, Cavalieri–Conway admits that "[e]ventually, all the repairs, except the peep-hole were made...." (Am. Compl. at 27.) Apparently, the only reason

Cavalieri–Conway experienced repair delays was because she steadfastly refused to permit any service people or Delores Underwood from entering her apartment when she was absent. (Am. Compl. at 24.) According to Cavalieri–Conway, the reason for her refusal was, because she "quickly figured out what Delores was after, coercing a bribe with treat to the Plaintiffs' belongings...." (Am. Compl. at 24.) She admits that the repairs would then be rescheduled to accommodate her. (Am. Compl. at 24.) Finally, Cavalieri–Conway admits that she "always spoke highly of [Defendants'] effort in maintaining the building" (Pl.'s Mem. in Supp. at 8), and that "she had a high opinion of [Defendants] until she was rejected to renew her lease" (Am. Compl. at 13).

Cavalieri–Conway provides no smoking gun and no "bits and pieces" of proof that "together compos[e] a convincing mosaic of discrimination...." *Troupe,* 20 F.3d at 737. Rather, her allegations can be characterized as unsupported, rambling and bizarre. Thus, Cavalieri–Conway cannot survive summary judgment under the direct method.

### b. Indirect Method

Nonetheless, Cavalieri–Conway may still survive summary judgment under the indirect method. *Kormoczy v. Secretary U.S. Dept. of Housing and Urban Dev.,* 53 F.3d 821, 823, 824 (7th Cir.1995); *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1531 (7th Cir.1990) "The *McDonnell Douglas* test recognizes that direct proof of unlawful discrimination is rarely available." *United States v. Badgett,* 976 F.2d 1176, 1178 (8th Cir.1992). In fact, several courts apply the *McDonnell Douglas* test in FHA cases without reviewing whether a plaintiff can survive summary judgment under the direct method. *See Badgett,* 976 F.2d at 1178 (stating that HUD has adopted the *McDonnell Douglas* test for evaluating actions under the FHA); *see also Secretary, U.S. Dept. of H.U.D. v. Blackwell,* 908 F.2d 864, 870 (11th Cir.1990) (stating that "the three part burden of proof test developed in *McDonnell Douglas* governs" discrimination cases under the FHA).

■ First, a plaintiff bears the initial burden of proving a prima facie case of housing discrimination by a preponderance of the evidence. *See generally McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If a plaintiff succeeds in establishing a prima facie case of discrimination, a presumption of illegality arises and the burden shifts to the defendant to articulate legitimate nondiscriminatory reasons for the challenged actions. *Badgett,* 976 F.2d at 1178. If the defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance that the nondiscriminatory reasons asserted by the defendant are merely pretext for discrimination. *Id.*

■ To establish a prima facie case of discrimination under the FHA, Cavalieri–Conway must show that: 1) she is a member of a protected class; 2) Defendants knew it; 3) she was qualified to rent the apartment; and 4) Defendants refused to rent her an apartment despite her qualifications. *Alexander on Behalf of Alexander v. Briar–Grace Management Co., Inc.,* No. 87–9348, 1989 WL 81958, at *3 (N.D.Ill. July 13, 1989) (*citing Hamilton v. Svatik,* 779 F.2d 383, 387 (7th Cir.1985)); *Cf. Maki v. Laakko,* 88 F.3d 361, 364 (6th Cir.1996) (stating essentially the same elements but adding that the plaintiff must show "that the housing or rental property was available" after the plaintiff's rejection). Cavalieri–Conway has shown a prima facie case of discrimination. She is a member of a protected class and Defendants knew it. Moreover, though her income was dependent on public aid, Cavalieri–Conway has shown her ability to pay the rent. Finally, Cavalieri–Conway has shown that Defendants refused to renew her lease despite her qualifications.

■ The court now turns to whether Defendants can produce a legitimate, non-discriminatory reason for their refusal to renew Cavalieri–Conway's lease. According to Butterman, it was his decision not to renew the lease. (Defs.12(M), Ex. A.) Butterman states that he did not renew Cavalieri–Conway's lease because of her bizarre and unsatisfiably demanding behavior, rather than because of any sexual bias. (*Id.*) Attached to Butterman's affidavit is a November 1995 letter

from Cavalieri–Conway which Butterman considered the final straw in his landlord-tenant relationship with her. (*Id.*, Ex. A1) Among other complaints, the letter states that the Underwoods arranged a bulletin board to send subliminal messages regarding Cavalieri–Conway,[6] that Delores Underwood's reply to one of Cavalieri–Conway's complaints was in "RED," and that Cavalieri–Conway's behavior was impaired by her necessity of "living on the run from pain caused by hostile managers." (*Id.*) It also includes the following passage which Butterman, who is Jewish, interpreted as anti-Semitic: "This is tantamount in saying 'no Jews can have Christian slaves. Only Christians can have Christian slaves. And we'll convert all Moslems to Christians, so there are no slaves that are not Christians, therefore Jews cannot own slaves.'" (*Id.*) By simply offering these legitimate reasons for the decision not to renew Cavalieri–Conway's lease, the court finds that Defendants have met their burden in the *McDonnell Douglas* framework.[7] *See Kahn v. U.S. Secretary of Labor*, 64 F.3d 271, 278 (7th Cir.1995) (stating that "the burden is simply one of production").

Despite Butterman's proffered legitimate, non-discriminatory reasons for his decision not to renew Cavalieri–Conway's lease, the court will not grant summary judgment if Cavalieri–Conway provides evidence from which a reasonable factfinder could infer that Butterman's proffered reason is false, and discrimination was his true motivation. *Coco v. Elmwood Care*, 128 F.3d 1177, 1179 (7th Cir.1997); *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 377–78 (7th Cir.1995). In other words, Cavalieri–Conway must pro-

duce evidence from which a rational factfinder could infer that Butterman lied about his reasons for not renewing her lease, and that the lie was a pretext for discrimination. *Coco*, 128 F.3d at 1179; *Schultz v. Gen. Elect. Capital Corp.*, 37 F.3d 329, 333–34 (7th Cir. 1994). Cavalieri–Conway has failed to do so.

In challenging Butterman's reasons for not renewing her lease, Cavalieri–Conway argues that the comment "no reason" in her eviction letter (dated March 14, 1996) and Butterman's initial refusal to speak to her after not renewing her lease indicate pretext. (Am. Compl. at 10.) In addition, she asserts that Defendants wanted to get rid of her and "subjected [her] to a long chain of troubles so that she would fall into the cleverly laid trap set for her" that, presumably, would provide reasons for Butterman not to renew her lease. (Am. Compl. at 15.)

▮ These arguments are not persuasive. First, the letter notifying Cavalieri–Conway of Butterman's intention not to renew her lease does not include the comment "no reason;" it simply serves to notify Cavalieri–Conway and is otherwise silent. Regardless, the silence as to any reason in the letter and by Butterman personally are insufficient to create an inference of pretext. *See Kizer v. Children's Learning Ctr.*, 962 F.2d 608, 613 (7th Cir.1992) (unfounded personal beliefs, supposition and conjecture are legally insufficient to establish pretext), Moreover, like an employer in a Title VII case, a landlord under the FHA may terminate a tenant's lease "for any reason, good or bad, or for no reason at all, as long as the [landlord's] rea-

---

6. Cavalieri–Conway's belief that "subliminal messages were arranged on the bulletin board" is also included in her amended complaint. (Am. Compl. at 26.)

7. Some courts have stated that "[t]he defendant's evidence of a good reason for refusing to deal with the plaintiff 'must be devoid of circumstances which it can be inferred that there was a real though subtle purpose of discrimination.'" *Hamilton v. Svatik*, 779 F.2d 383, 387 (7th Cir. 1985) (*quoting Kaplan v. 442 Wellington Coop. Bldg. Corp.*, 567 F.Supp. 53, 56 (N.D.Ill.1983)); *see also Anast v. Commonwealth Apartments*, 956 F.Supp. 792, 800 n. 3 (N.D.Ill.1997). This approach seems to preempt the "pretext" stage of the *McDonnell Douglas* test, in that it instead

places "the burden on the defendant to show that he acted without any discriminatory intent." *Id.* However, the court declines to adopt this approach in light of its earlier determination that a plaintiff alleging disparate treatment under the FHA bears the burden to show discriminatory intent. *See* footnote 4, supra; *see also Kormoczy v. Secretary, U.S. Dept. of H.U.D.*, 53 F.3d 821, 823–24 (7th Cir.1995) (referring to the application of the *McDonnell Douglas* test in a disparate treatment claim under the FHA). In any event, the court finds that Butterman has offered evidence of several good reasons for his refusal to renew Cavalieri–Conway's lease and that those reasons lack any indication of discriminatory intent.

son is not proscribed by a Congressional Statute." *Kahn v. U.S. Secretary of Labor,* 64 F.3d 271, 279 (7th Cir.1995) (citation omitted); *see also Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1399 (7th Cir.1997); *Cross v. Roadway Express,* 51 F.3d 275 (Table), 1995 WL 135743, at *6 n. 9 (7th Cir. 1995); *Bruno v. City of Crown Point,* 950 F.2d 355, 364 (7th Cir.1991); *compare Snyder v. Barry Realty,* 953 F.Supp. 217, 221–23 (N.D.Ill.1996) (discussing the determination of pretext in a disparate impact case). With respect to the "trap" that Defendants allegedly set, Cavalieri–Conway does not dispute that she had continuing difficulties with Defendants which were not related to her sex. Furthermore, Cavalieri–Conway does not deny that she entered a settlement agreement with Defendants in state court under which she was obligated to vacate the apartment. In sum, Cavalieri–Conway has not provided any evidence that would create an inference that Butterman's reasons for not renewing her lease were a pretext for discrimination. Therefore, her claim of sexual discrimination under the indirect method must also fail.

*2. Sexual Harassment*

In addition to sexual discrimination, Cavalieri–Conway accuses Defendants of sexual harassment under the FHA. *See DiCenso v. Cisneros,* 96 F.3d 1004, 1008 (7th Cir.1996) (recognizing a cause of action for sexual harassment under the FHA); *see also Krueger v. Cuomo,* 115 F.3d 487, 491 (7th Cir.1997) (same). In support of her claim, Cavalieri–Conway refers to nearly the same factual allegations as her sexual discrimination claim. Specifically, Cavalieri–Conway again:

1) refers to the comments allegedly made by Robert Underwood in which he threatened to call her a whore if she had sexual partners;

2) accuses Robert Underwood of keeping her under surveillance; and

3) accuses Defendants of conditioning repairs and her lease on her remaining chaste.

In addition, she cites the following incident: During the Christmas holiday season of 1994, when Dolores Underwood suggested among other things that [Cavalieri–Conway] was not "hot stuff," "fat," and "not worthy of being taken out to dinner" after showing off [Delores Underwood's] new face lift and signaling a new turn in their relationship and damaging their bond as friends.

(Am. Compl. at 10), *see also* (Pl.Mem. in Supp. at 9.)

 A claim for sexual harassment is cognizable under two theories: (1) allegations supporting a hostile environment claim; and/or (2) allegations supporting a "conditional tenancy" or "quid pro quo" claim, which accuses housing management of premising a lease or lease conditions on the exchange of sexual favors. *See Grieger v. Sheets,* No. 87–6567, 1989 WL 38707, at *2 (N.D.Ill. Apr. 10, 1989) (contrasting a "hostile environment" claim with a "conditioned tenancy" or "quid pro quo" claim). Based on Cavalieri–Conway's accusation that Defendants conditioned her tenancy on her chastity, it may appear that Cavalieri–Conway is attempting to bring her sexual harassment claim under the "conditional tenancy" or "quid pro quo" theory. However, the court's research reveals that the theory applies only when a defendant demands sexual favors in exchange for favorable treatment. *See Mary M. v. North Lawrence Community School Corp.,* 131 F.3d 1220, 1997 WL 763470, at *9 n. 7 (7th Cir.1997) ("Quid pro quo" sexual harassment "occurs when the receipt of benefits or the maintenance of the status quo is conditioned on acquiescence to sexual advances"). That is not the case here. Thus, the court characterizes Cavalieri–Conway's sexual harassment claim as an attempt to describe an environment that was hostile and offensive in a sexually harassing manner.

 As with sexual discrimination claims, courts rely on a Title VII analysis in reviewing "hostile environment" claims of sexual harassment under the FHA. *DiCenso,* 96 F.3d at 1008. In *DiCenso,* the court explained:

Applied to the housing context, a claim is actionable when the offensive behavior unreasonably interferes with use and enjoy-

ment of the premises. Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances, and factors may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance.... We repeatedly have held that isolated and innocuous incidents do not support a finding of sexual harassment.

*Id.* (internal citations and quotation marks omitted).

A review of the totality of the circumstances convinces the court that Cavalieri–Conway's claim of sexual harassment is without merit. First, Robert Underwood's threat to call Cavalieri–Conway a whore is not sufficiently egregious to constitute harassment. That is, Cavalieri–Conway does not provide any evidence that Robert Underwood carried through on this perceived threat, or that his conduct went beyond an offensive, verbal insult. Moreover, Cavalieri–Conway has not alleged any physical touching, demands for sexual favors, or evidence that Robert Underwood harassed other female tenants in a similar fashion. *See Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993) ("Evidence of harassment of other female tenants is relevant to plaintiffs' claim."). Most notably, however, Cavalieri–Conway admits that Robert Underwood made the threat to call her a name on only two occasions way back in 1992. *See DiCenso*, 96 F.3d at 1008 ("Though sporadic behavior, if sufficiently abusive, may support a [discrimination] claim, success often requires repetitive conduct."); *see also Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir.1993) ("It is not sufficient if the harassment is isolated or trivial.... Hostile environment claims usually involve a long-lasting pattern of behavior").

Furthermore, Robert Underwood's alleged threat was not coupled with any threat of physical harm. *See, e.g., Grieger v. Sheets*, No. 87–6567, 1989 WL 38707, at *3 (N.D.Ill. Apr. 10, 1989) (landlord threatened to shoot tenant after she confronted him about his demands for sex). Cavalieri–Conway's totally unsupported allegation that he kept her under surveillance does not suffice. She fails to provide any evidence, whether in the form of witnesses, statements, or recollections of specific incidents that would support such an allegation. The same can be said about her allegation that Defendants restricted her sex life. *See also* supra, at 11–12. Nothing in the pleadings touches on what her "sex life" is or is not. Finally, like Robert Underwood's alleged threat, Delores Underwood's alleged insults of Cavalieri–Conway are not evidence of sexual harassment. In sum, Cavalieri–Conway's unsupported allegations, taken together, are insufficient to constitute evidence of sexual harassment as a matter of law. Even if her allegations are taken as true, she has not shown that they were sufficiently egregious to unreasonably burden her tenancy. *See Stewart–Grove v. Alpha Construction Co.*, 132 F.3d 37, 1997 WL 786907, at *2 (7th Cir.1997) (reviewing past cases where courts held that certain sexually offensive behavior did not reach the necessary severity level of sexual harassment); *see also DiCenso*, 96 F.3d at 1009 (landlord's sexually offensive comment and caressing of tenant was insufficient to constitute a sexually hostile environment because it was an isolated incident and was not coupled with the touching of an intimate body part or threats of physical harm). Indeed, her statement that "I appreciate [the Underwoods] as people but abhor them as residential managers as the profession is in general nasty" hardly suggests that she was the ongoing victim of sexual harassment. (Defs.12(M), Ex. A1); *see also* (Pl.Mem. in Supp. at 8) ("I personally liked [Defendants], but often made the distinction I didn't like their profession.")

### 3. Retaliation

Relying on the same factual allegations as her other counts under the FHA, Cavalieri–Conway alleges that Defendants refused to make repairs and renew her lease because she complained of sexual harassment and opposed sexual discrimination. (Am. Compl. at 5, 6, 12.) Section 3617 of the FHA states that:

It shall be unlawful to coerce, intimidate, threaten, or interfere, with any person in the exercise or enjoyment of, or on account

of his having exercised or enjoyed ... any rights granted or protected by section 3603, 3604 ... of [the FHA].

42 U.S.C. § 3617 (1994). Defendants deny Cavalieri–Conway's allegations and repeat the reasons why Cavalieri–Conway's lease was not renewed.

 The court finds that Cavalieri–Conway's claim of retaliation is without merit. First, the court notes that Butterman chose not to renew Cavalieri–Conway's lease in March 1996, well-before she complained of any discrimination to any government agency. Most notably, however, the Seventh Circuit has held that "where the conduct that allegedly violated section 3617 is the same conduct that allegedly violated section 3604(a) and was engaged in by the same party, the validity of the section 3617 claim depends upon whether the [conduct] violated section 3604(a)." *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1288 n. 5 (7th Cir. 1977); *see also South–Suburban Housing Ctr. v. Greater South Suburban Bd. of Realtors,* 935 F.2d 868, 886 (7th Cir.1991); *Cass v. American Properties, Inc.,* No. 94–2977, 1995 WL 132166, at *3 (N.D.Ill. Feb. 27, 1995). Other courts have extended this reasoning to § 3617 claims that are based on the same alleged conduct supporting unsuccessful claims under other sections of the FHA. *See South–Suburban Housing Ctr.,* 935 F.2d at 886 (concluding that a § 3617 claim was meritless because it was based on the same conduct supporting an unsuccessful claim under § 3606); *Cass,* 1995 WL 132166, at *3 (finding this reasoning applicable where a § 3617 claim is based on any subsection of § 3604). Thus, because the court has already found that Cavalieri–Conway's allegations under § 3604(a) and (b) are unfounded, her retaliation claim, based on the same alleged conduct, must also fail.

## C. Age Discrimination under the IHRA

 Cavalieri–Conway also alleges that Defendants discriminated against her based on her age in violation of the Illinois Human Rights Act ("IHRA"). *See* 775 ILCS 5/1–102(A), 775 ILCS 5/3–102, 775 ILCS 5/1–102(F) (1997). The IHRA states that "[e]x-

cept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in [the] Act," 775 ILCS 5/8–111(C) (1997). Cavalieri–Conway already has unsuccessfully litigated this claim before the Illinois Department of Human Rights ("IDHR"), which has exclusive jurisdiction overall claims arising under the IHRA. *Talley v. Washington Inventory Service,* 37 F.3d 310, 311 (7th Cir.1994). A federal district court may exercise jurisdiction only to review the IDHR's actions. *Id.* at 312–13: *see also Coleman v. O'Grady,* No. 94–6035, 1996 WL 167344, at *4 (N.D.Ill. Apr, 4, 1996) (citations omitted). Cavalieri–Conway does not request that the court review the IDHR's decision. Thus, the court lacks subject matter jurisdiction.

The court also notes that the doctrine of res judicata may bar Cavalieri–Conway's claim of age discrimination. *See Whitaker v. Ameritech Corp.,* 129 F.3d 952, 956 (7th Cir. 1997) (discussing res judicata); *Welch v. Johnson,* 907 F.2d 714, 718–26 (7th Cir.1990). The court emphasizes that "[i]n discrimination cases, the federal courts are not a last resort for plaintiffs disappointed by the outcome of state litigation." *Wallace v. American Air Filter,* No. 92–3795, 1994 WL 673028, at *3 (N.D.Ill.1994). Here, the IDHR dismissed Cavalieri–Conway's claim of age discrimination for "lack of substantial evidence." (Defs.' 12(M), Ex. G.) However, the burden was on Defendants to raise res judicata as an affirmative defense. *Allahar v. Zahora,* 59 F.3d 693, 696 (7th Cir.1995). Though Defendants attach a copy of the IDHR's decision to their motion, they do not argue that the decision serves as res judicata. Thus, the court finds that Defendants have not met their burden.

 Nonetheless, even if the court had jurisdiction and res judicata did not apply, Cavalieri–Conway does not submit evidence in support of her allegations. Her allegations of age discrimination are identical to the ones she offers in support of her sexual discrimination claim. As discussed above, the court found those allegations without merit. Additionally, the court notes that it is undisputed that there were several other ten-

ants who were over the age of forty living in the building. (Pl.12(N) at 3.) Thus, the court holds that Cavalieri–Conway's age discrimination claim is without merit.

### D. Intentional Infliction of Emotional Distress

Cavalieri–Conway also accuses Defendants of common law intentional infliction of emotional distress ("IIED"). Defendants contend that they are entitled to judgment as a matter of law because Cavalieri–Conway's allegations are insufficient to support a claim for IIED. The court agrees.

The elements of a cause of action in Illinois for IIED are:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that this conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.

*Oates v. Discovery Zone,* 116 F.3d 1161, 1174 (7th Cir.1997) (citation omitted). " '[L]iability for intentional infliction of emotional distress has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of human decency.' " *Id. (quoting Public Fin. Corp. v. Davis,* 66 Ill.2d 85, 4 Ill.Dec. 652, 360 N.E.2d 765, 767 (1976)) (brackets in original). "In determining whether the defendant's conduct is so qualified, an objective standard, based on all the facts and circumstances of the particular case, is employed." *Cook v. Winfrey,* 975 F.Supp. 1045, 1054 (N.D.Ill.1997) (citation omitted). "Mere insults, indignities, threats; annoyances, petty oppressions or trivialities," [citation omitted], as well as acts which only inconsiderate, rude, vulgar, uncooperative, unprofessional and unfair, [citation omitted], do not constitute conduct which is actionable under a theory of intentional infliction of emotional distress. *Oates,* 116 F.3d at 1174 (citations and internal quotation marks omitted).

In support of her IIED claim, Cavalieri–Conway simply reiterates her allega-

tions of sexual discrimination, sexual harassment, and retaliation. (Am. Compl. at 31–36.) The court already has held that Cavalieri–Conway provides no evidence in support of those claims. *See Piech v. Arthur Andersen & Co.,* 841 F.Supp. 825, 831 (N.D.Ill. 1994) ("A claim for intentional infliction of emotional distress ... requires more than what is required for sexual harassment."). Nonetheless, even assuming that the conduct which Cavalieri–Conway alleges actually occurred, none of it rises to the level of extreme and outrageous. At the very most, Cavalieri–Conway was subject to a couple of insults and the disfavor of building management. *See Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 703 (7th Cir.1993) (recounting repeated allegations of discriminatory conduct and holding that they did not reach the level of extreme and outrageous); *Cf. Kane v. Oak Trust and Savings Bank,* No. 93–1708, 1995 WL 683820, at *7 (N.D.Ill. Nov. 16, 1995) (property managers' repeated, harassing phone calls at all hours coupled with threats of physical violence were evidence of extreme and outrageous conduct towards tenants). Thus, Cavalieri–Conway cannot possibly satisfy the first element of an IIED claim.

In addition, Cavalieri–Conway's IIED claim fails because she fails to provide evidence of severe emotional distress. Cavalieri–Conway states that because of her "battle" with Defendants, she lost confidence and morale in prosecuting her employment discrimination case, and that her reputation has suffered. "Her eldest son turned against her because he felt she was unworthy and wasn't a good mother which made the Plaintiff cry." (Am. Compl. at 13.) She also claims to have had a nightmare of being robbed (Am. Compl. at 12) and sleepless nights (Pl. Resp. at 4). Moreover, she states that she is distraught (Pl. Resp. at 4) and that she suffers from anxiety because her new living accommodations are not safe (Am. Compl. at 14). Finally, she claims that she has been "injured by the overwhelming ordeal and fear of not knowing how she would survive the onslaught of having no apartment to keep all of her discrimination files." (Am. Compl. at 14.)

Though Cavalieri–Conway may have suffered some hardship, it is well-established that emotional distress alone is not enough; it must be severe. *Cook,* 975 F.Supp. at 1054 (*citing Public Finance,* 4 Ill.Dec. 652, 360 N.E.2d at 767). "Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable. 'The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it....'" *Public Finance,* 4 Ill.Dec. 652, 360 N.E.2d at 767 (*quoting* Restatement (Second) of Torts, sec. 46, comment j (1965)), *see also Khan v. American Airlines,* 266 Ill.App.3d 726, 203 Ill.Dec. 171, 639 N.E.2d 210, 215 (1994) (plaintiff's insomnia and repeated nightmares based on his false arrest did not constitute severe emotional distress as a matter of law). Here, Cavalieri–Conway does not provide evidence that she suffered distress so severe that no reasonable person could endure it. Because there is no evidence to satisfy the first and third elements of a claim for IIED, the court holds that Cavalieri–Conway's claim must fail as a matter of law.

#### E. Intentional Interference with Business or Economic Relationship

In her final count, Cavalieri–Conway accuses Defendants of "intentional interference with business or economic relationship." As an initial matter, the court notes that Cavalieri–Conway has attempted to invoke this tort without a sound factual or legal basis. Nonetheless, sorting out Cavalieri–Conway's convoluted and myriad allegations, the court has extracted the following as the gravamen of Cavalieri–Conway's claim:

1) Defendants interfered with her lease by "statements and actions making the Plaintiff appear undesirable as a tenant through isolation, insulation, wrongful treatment, false allegations...." (Am. Compl. at 38); and

2) Butterman's failure to renew her lease "interfered with [her] housing relationship by giving her a public record deemed to be both negative and unfavorable for obtaining a tenant referral in the Chicago land residential real estate market...."

(Am. Compl. at 36.) In other words, Cavalieri–Conway appears to be alleging that: 1) the Underwoods interfered with the conditions of her lease and improperly influenced Butterman not to renew her lease; and 2) Butterman's refusal to renew her lease interferes with her ability to obtain a new lease in another, comparable apartment.

Defendants construe these allegations as an attempt to bring claims of intentional interference with contract and intentional interference with prospective economic advantage, respectively. They argue that Cavalieri–Conway does not provide evidence in support of the requisite elements under either theory. The court agrees.

The court will first address the tort of intentional interference with contract. The elements of tortious interference with contract are: (1) the existence of a valid and enforceable contract between the plaintiff and another party; (2) defendant's knowledge of the existing contract, (3) an intentional and unjustified inducement of a breach of the contract by the defendant; (4) the subsequent breach by a third person due to defendant's inducement; and (5) resulting damage to plaintiff. *Williams v. Shell Oil,* 18 F.3d 396, 402 (7th Cir.1994) (citation omitted), *see also Sangston v. Ridge Country Club,* 35 F.3d 568 (Table), 1994 WL 487303, at *8 (7th Cir.1994) (*citing Prince v. Zazove,* 959 F.2d 1395, 1397 (7th Cir.1992)). Without even addressing the alleged conduct of the Underwoods, the court concludes that Cavalieri–Conway's claim must fail because there was no breach of contract here. *See Cook v. Winfrey,* 975 F.Supp. 1045, 1053 (N.D.Ill. 1997) ("It is well established that no cause of action exists for intentional interference with a contract under Illinois law if the plaintiff has failed to establish that there was an actual breach of contract."). That is, there was no agreement to allow Cavalieri–Conway to live at the building for another term. Therefore, when Butterman chose not to renew Cavalieri–Conway's lease, he did not commit a breach of an existing contract;

rather he simply allowed the lease agreement to expire.[8]

 Turning to Cavalieri–Conway's claim of tortious interference with prospective economic advantage, the elements of that tort are: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the interference." *Anderson v. Vanden Dorpel,* 172 Ill.2d 399, 217 Ill.Dec. 720, 667 N.E.2d 1296, 1299 (1996) (citation omitted). It is also well-established that "the tortious interference allegedly committed by the defendant must be directed toward a third party—not the plaintiff." *Silk v. City of Chicago,* No. 95–0143, 1997 WL 790598, at * 19–20 (N.D.Ill.Dec.17, 1997) (citing several cases); *Cook,* 975 F.Supp. at 1052 (stating that a plaintiff must allege "action by the interfering party directed towards the party with whom the plaintiff expects to do business") (internal quotation marks and citation omitted). Cavalieri–Conway has not provided any evidence in support of these elements. *See Cook,* 975 F.Supp. at 1052 ("Unfulfilled hopes cannot be the basis for a claim of tortious interference with prospective economic advantage....."). For instance, there is no evidence that Cavalieri–Conway expected to sign a lease with a specific lessor but was unable to do so because of some type of "interference" by Defendants. *See id.* (rejecting plaintiff's claim of intentional interference because he made only "general assertions" with respect to whom he would have done business with). Indeed, her claim is far-fetched and may not even be cognizable. Finally, Cavalieri–Conway does not provide any evidence that her eviction has entirely hampered her ability to obtain new living accommodations. Thus, her claim must fail.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion is granted and Cavalieri–Conway's is denied. Because Cavalieri–Conway has not provided a scintilla of evidence in support of her claims, the court holds that no reasonable jury could return a verdict in her favor.

IT IS SO ORDERED.

---

8. In her response, Cavalieri–Conway rewords her allegations in an attempt to meet the elements for the tort of intentional interference with contract. Her assertion that Defendants breached a "contract" by violating the City of Chicago Landlord–Tenant Ordinance is also unsupported and without merit. (Pl. Resp. at 11.)